**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Casey E. Sadler (#274241)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Capstone Turbine Corp. Sec. Litig.* | Case No. CV 15-8914 DMG (RAOx)<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 8

IV. BACKGROUND .......... 13

A. Capstone Sells Its Products Through a Distributor System .......... 14

B. Capstone Derives Its Revenue from Two Sources; Selling Products and Warranty Plans .......... 15

V. DEFENDANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED GAAP BY IMPROPERLY RECOGNIZING REVENUE AND/OR FAILING TO TIMELY RECOGNIZE BAD DEBT EXPENSE .......... 16

A. Obligations Imposed by the Securities Laws and U.S. GAAP .......... 16

B. The Company Systematically Violated Its Own Revenue Recognition Policy As Well As GAAP Revenue Recognition Principles .......... 17

C. The Company's Knowingly and/or Recklessly Improper Recognition of Revenue Related to "Sales" to BPC in the Company's 2014 Fiscal Fourth Quarter and 2015 Fiscal First Quarter .......... 19

1. Capstone Improperly Recognized Revenue When Collectability Was Not Reasonably Assured .......... 21

2. Capstone Improperly Recognized Revenue Even Though the Sales Price Was Not Fixed or Determinable .......... 24

D. Capstone Violated GAAP by Overstating Capstone's Accounts Receivables .......... 27

E. CAPSTONE'S ADDITIONAL GAAP VIOLATIONS ..................... 29

VI. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY FALSE AND/OR MISLEADING FINANCIAL STATEMENTS ............................ 31

A. Financial Misstatements in the Company's 2014 Fiscal Fourth Quarter and Fiscal Year Financial Results ........................................ 32

B. Financial Misstatements in the Company's 2015 Fiscal First Quarter Financial Results ............................................................... 34

C. Financial Misstatements in the Company's 2015 Fiscal Second Quarter Financial Results ............................................................... 36

D. Financial Misstatements in the Company's 2015 Fiscal Third Quarter Financial Results ............................................................... 37

VII. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY FALSE AND/OR MISLEADING STATEMENTS REGARDING THE COMPANY'S BACKLOG ........................................................................ 39

A. The Company's Backlog Was Drastically Overstated During the Class Period ........................................................................... 39

B. Defendants Made Materially False and Misleading Statements Concerning the Company's Backlog During the Class Period........... 43

VIII. THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING SARBANES-OXLEY CERTIFICATIONS ....................... 52

IX. LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD.................................... 54

X. ADDITIONAL SCIENTER ALLEGATIONS ........................................... 70

A. BPC Was One of Capstone's Largest Customers ............................... 71

B. Throughout the Class Period the Individual Defendants Communicated Directly with Representatives of BPC ...................... 73

C. The Individual Defendants Personally Approved Discounts and Changes in Contract Terms ..... 75

D. The Individual Defendants Claimed to Have Conducted a Review of Capstone's Backlog ..... 76

XI. CLASS ACTION ALLEGATIONS ..... 78

XII. UNDISCLOSED ADVERSE FACTS ..... 80

XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..... 81

XIV. NO SAFE HARBOR ..... 84

XV. COUNTS ..... 85

XVI. PRAYER FOR RELIEF ..... 91

XVII. JURY TRIAL DEMANDED ..... 91

Lead Plaintiffs Randall G. Kay and Elizabeth R. Kay and plaintiffs David Kinney and John Perez ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Capstone Turbine Corp. ("Capstone" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued by and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) investigative interviews with persons having first-hand knowledge of the Company's operations.

## I. NATURE OF THE ACTION

1. This is a securities class action on behalf of a class consisting of all those who purchased Capstone securities between June 12, 2014 and November 5, 2015, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.[1]

---

[1] On November 9, 2015, after the end of the Class Period, the Company completed a 1:20 reverse stock split. The prices used in this complaint reflect the pricing and losses incurred by investors, using the post-stock split trading prices.

2. This case is straightforward: Defendants[2] engaged in securities fraud by issuing inflated financial results and overstating the Company's sales orders backlog. Defendants represented to the public significant revenue (and resulting accounts receivable) from sales of its products to its primary Russian distributor, BPC Engineering ("BPC"), while in reality, payments on these sales were not reasonably assured and Capstone was providing payment concessions to BPC. Immediately recognizing revenue upon the shipment of goods while knowing payment is not reasonably assured and that the payment terms of the transactions are not fixed and determinable clearly violates Generally Accepted Accounting Principles ("GAAP"), SEC accounting guidelines, and Capstone's own stated revenue recognition policy. Unsurprisingly, the Company ultimately took a bad debt reserve against BPC's receivables.

3. Additionally, throughout the Class Period, Defendants touted their large backlog, which signified the amount of sales orders received by Capstone that had yet to be fulfilled, completed, or fully paid for, as indicative of future sales and performance. However, as confirmed by a confidential witness, the Company's backlog improperly contained tens of millions of dollars in purported orders from BPC, which BPC strategically used to maintain lower prices from

[2] "Defendants" refers to Capstone, Darren R. Jamison ("Jamison"), Edward I. Reich ("Reich") and Jayme Brooks ("Brooks").

prior years. At the end of the Class Period, Defendants confirmed the overstatement of the backlog by removing over $50 million of BPC's purported sales orders, some of which were almost a decade old.

4. Capstone develops, manufactures, markets and services microturbine technology solutions for use in stationary distributed power generation applications. According to the Company, the turbines are environmentally friendly, compared to competing technologies.

5. Capstone utilizes a network of distributors to sell the turbines. Capstone typically sells to the distributors that, in turn, sell to end users. As admitted by Capstone, BPC is one of the Company's largest and most important distributors.

6. On June 12, 2014, even though Defendants admitted that they were aware of sanctions placed on Russia due to its involvement in the conflict in the Ukraine, and that there were articles published regarding the impact of these sanctions, Capstone immediately recognized revenue of approximately $9.1 million from purported sales to BPC during the Company's 2014 fiscal fourth quarter.[3]

7. However, Capstone did not receive full payment for these transactions within 90 days in accordance with its standard payment terms. In fact, due to

[3] The Company's fiscal year runs from April 1st to March 31st.

BPC's non-payment, during the Company's 2015 fiscal first quarter, there was a significant increase in Capstone's Days Sales Outstanding ("DSO"), a representation of the average number of days between sales and associated payments, and a particularly staggering increase in its days sales outstanding for its BPC sales:[4]

| | *Q4 2014* | *Q1 2015* |
|---|---|---|
| DSO | 70 | 95 |
| BPC DSO | 72 | 259 |

8. Despite the fact that BPC was not paying for its products in a timely manner, which itself constitutes an improper payment concession, on August 7, 2014, the Company reported an additional $3.0 million in purported revenue related sales to BPC during the Company's 2015 fiscal first quarter.

9. In order recognize revenue, GAAP requires that "collectibility is reasonably assured" and that "the seller's price to the buyer is fixed or determinable"; if the requirements are not met, recognizing revenue is

[4] When the Company disclosed on August 7, 2014 that it had only collected approximately $1.6 million from BPC for the quarter, the Company's DSO was increasing (as well as the DSO for BPC's receivables), and Capstone's accounts receivables were $24.2 million, shares of Capstone declined $4.40 per share, or 15.5%, to close at $24.00 per share on August 8, 2014, on unusually heavy volume.

inappropriate. As such, recognizing revenue on these transactions with BPC was a clear violation of GAAP.

10. In March 2015, Capstone stopped shipping new products to BPC and disclosed that going forward Capstone would only sell new products to BPC if BPC paid the full cost in cash prior to shipment. Additionally, during March 2015, BPC informed Capstone that they were going to have to downsize a large order of products. In spite of this, the Company continued to include massive amounts of purported sales orders from BPC in the Company's backlog.

11. On June 15, 2015, Capstone, while touting the purported increase in its backlog as a positive indicator of future performance, finally admitted that it needed to take a bad debt reserve of over $7 million against BPC's receivables since collectability was not reasonably assured. As the Company explained:

> During the three months ended March 31, 2015, we recorded approximately $7.1 million with respect to the accounts receivable allowance from BPC. We determined that the collectability of this accounts receivable balance was not reasonably assured based on BPC's recent payment history and because the impact of the steep decline of the Russian ruble could continue to negatively impact its ability to pay its outstanding accounts receivable balance.

12. On this news, shares of Capstone declined $1.81 per share, or 16.1%, to close at $9.40 per share on June 16, 2015, on unusually heavy volume.

13. Additionally, on June 15, 2015, Defendants represented that they had a conducted a review of Capstone's backlog and determined that its backlog was

accurate and that it was unnecessary to remove any of BPC's purported sales orders from the backlog.

14. On October 1, 2015, Defendants admitted that "the Company received no significant payments from its Russian distributor, who until recently was one of their largest customers."

15. On this news, shares of Capstone declined $1.74 per share, or 25.5% to close at $5.06 per share on October 1, 2015 on unusually heavy volume. The stock price continued to decline, falling by $0.24, or 4.8%, to close at $4.82 per share on October 2, 2015, and another $0.42, or 8.7% , to close at $4.40 per share on October 5, 2015, on heavy volume.

16. On November 5, 2015, the Company finally revealed that it was removing ***$52.4 million*** from the backlog related to purported sales orders from BPC.

17. On this news, shares of Capstone declined $0.32 per share, or 7.2% to close at $5.06 per share on November 6, 2015 on unusually heavy volume. The stock price continued to decline, falling by $0.95, or more than 23%, to close at $3.04 on November 9, 2015, another $0.25, or approximately 8%, to close at $2.79 on November 10, 2015, and another $0.62, or approximately 22%, to close at $2.17 per share on November 11, 2015 on heavy volume.

18. Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's securities. Plaintiffs and other Class members have suffered significant losses and damages at the hands of Defendants and are entitled to redress.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's corporate headquarters are located in this Judicial District.

22. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

23. Lead Plaintiffs Randall G. Kay and Elizabeth R. Kay, as set forth in the certifications previously filed with the Court (Dkt. No. 28-2), purchased Capstone securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24. Plaintiff David Kinney, as set forth in the certification previously filed with the Court (Dkt. No. 1), purchased Capstone securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25. Plaintiff John Perez, as set forth in the certification attached hereto, purchased Capstone securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26. Defendant Capstone is a Delaware corporation that trades on the NASDAQ Stock Market ("NASDAQ"), with its principal executive offices located

at 21211 Nordhoff Street, Chatsworth, California 91311. During the Class Period, Capstone, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

27. Defendant Darren R. Jamison ("Jamison") was, at all relevant times, President, Chief Executive Officer ("CEO") and a director of Capstone. Defendant Jamison joined Capstone in December 2006 as President and CEO and has been a director since December 2006. Prior to December 2006, Defendant Jamison served as President, Chief Operating Officer and Executive Vice President of Operations for Northern Power Systems, Inc., a company that designs, manufactures and sells wind turbines into the global marketplace. Prior to joining Northern Power Systems, Inc., Defendant Jamison was Vice President and General Manager of Distributed Energy Solutions for Stewart & Stevenson Services, Inc., a leading designer, manufacturer and marketer of specialized engine-driven power generation equipment to the oil and gas, renewable and energy efficiency markets. Defendant Jamison holds a Bachelor of Arts degree in Business Administration and Finance from Seattle University.

28. Defendant Edward I. Reich ("Reich") was, at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of Capstone from

February 11, 2008 to April 10, 2015. Defendant Reich joined Capstone in August 2005. He served as the Company's, Director of Financial Planning and Analysis from August 2005 to August 2006, and Capstone's Vice President, Financial Planning and Analysis from August 2006 to February 2008. Prior to his employment with Capstone, Defendant Reich served as Corporate Controller of Kistler Aerospace Corporation of Rocketplane Kistler, Inc. from 1996 to 2005. Prior to 1996, Defendant Reich helped start Kinetic Parts Manufacturing, a company specializing in brake rotors subsequently sold to TRW Automotive, and served as its Controller. Defendant Reich started his career in public accounting and worked with a variety of clients in distribution, manufacturing and retail. He is a member of Financial Executives International. Defendant Reich has a Bachelor of Science degree in Accounting and Bachelor of Arts degree in Business Administration from San Diego State University and is a Certified Public Accountant licensed in the State of California.

29. Defendant Jayme Brooks ("Brooks") was, at all relevant times, CFO of Capstone since April 10, 2015 and the Company's Chief Accounting Officer at all relevant times. Defendant Brooks served as the Company's Vice President of Finance November 2008 to April 2015, Capstone's Vice President of Financial Planning and Analysis from February 2008 to November 2008, and the Company's Director of Financial Reporting from September 2005 to February 2008. Prior to

joining Capstone, Defendant Brooks was Vice President and Controller of Computer Patent Annuities North America LLC, a company providing solutions for intellectual property management needs, technology renewal services, software tools and portfolio management. Defendant Brooks holds a Bachelor of Arts degree in Business Economics from the University of California at Santa Barbara and a Master of Business Administration degree from the Fuqua School of Business at Duke University. Defendant Brooks is a Certified Public Accountant licensed in California and a member of Financial Executives International.

30. Defendants Jamison, Reich and Brooks are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Capstone's reports to the SEC, press releases and public presentations to securities analysts, money and portfolio managers and institutional investors. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then

materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were "group-published" information, the result of the collective actions of the Individual Defendants.

31. During the Class Period, the Individual Defendants participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic reports with the SEC, including:

- The press release attached to the Form 8-K filed with the SEC on June 12, 2014 ("2014 Form 8-K") and the Form 10-K filed with the SEC on June 12, 2014 ("2014 Form 10-K");
- The press release attached to the Form 8-K filed with the SEC on August 7, 2014 ("Q1 2015 Form 8-K") and the Form 10-Q filed with the SEC on August 7, 2014 ("Q1 2015 Form 10-Q");
- The press release attached to the Form 8-K filed with the SEC on on November 6, 2014 ("Q2 2015 Form 8-K") and the Form 10-Q filed with the SEC on November 6, 2014 ("Q2 2015 Form 10-Q");
- The press release attached to the Form 8-K filed with the SEC on February 5, 2015 ("Q3 2015 Form 8-K") and the Form 10-Q filed with the SEC on February 5, 2015 ("Q3 2015 Form 10-Q");

- The press release attached to the Form 8-K filed with the SEC on June 15, 2015 ("2015 Form 8-K") and the Form 10-K filed with the SEC on June 15, 2015 ("2015 Form 10-K");
- The press release attached to the Form 8-K filed with the SEC on August 6, 2015 ("Q1 2016 Form 8-K") and the Form 10-Q filed with the SEC on August 6, 2015 ("Q1 2016 Form 10-Q"); and
- The press release attached to the Form 8-K filed with the SEC on November 5, 2015 ("Q2 2016 Form 8-K") and the Form 10-Q filed with the SEC on November 5, 2015 ("Q2 2016 Form 10-Q").

As alleged herein, certain of these SEC filings contained material misrepresentations and omissions when issued. In addition, throughout the Class Period, the Individual Defendants participated in the Company's quarterly and/or annual earnings conference calls wherein they made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others.

## IV. BACKGROUND

32. Capstone develops, manufactures, markets and services microturbine technology solutions for use in stationary distributed power generation applications, including cogeneration (combined heat and power, integrated combined heat and power, and combined cooling, heat and power), renewable

energy, natural resources and critical power supply. In addition, the Company's microturbines can be used as battery charging generators for hybrid electric vehicle applications. Microturbines can purportedly produce power on-site in parallel with the electric grid or stand alone when no utility grid is available.

33. According to the Company, Capstone's microturbines are environmentally friendly generators of electricity and heat compared to competing technologies. The microturbines operate on the same principle as a jet engine with the added capability of using a variety of commercially available fuels.

### A. Capstone Sells Its Products Through a Distributor System

34. Capstone sells its microturbine products, parts and service through a large network of distributors. According to the Company, these distributors are strategically placed independent partners of Capstone marketing and selling the Capstone products and services on its behalf. The distributors often are granted exclusivity for a particular marketplace and/or region, or country if it is an international distributor. According to the Company, Capstone currently has more than 95 distributors worldwide.

35. These distributors purchase Capstone's products for sale to end users and also provide application engineering and installation support. According to the Company, Capstone's standard terms of sales to distributors (and direct end users) include transfer of title, care, custody and control at the point of shipment, payment

terms ranging from full payment in advance of shipment to payment in 90 days, no right of return or exchange, and no post-shipment performance except for warranties provided on the products and parts sold. In fact, according to the Company, it does not typically have customer acceptance provisions in its agreements.

### B. Capstone Derives Its Revenue from Two Sources; Selling Products and Warranty Plans

36. The Company's revenue is derived from the products it sells through its global distribution network and through the sale of its Factory Protection Plan ("FPP").

37. Capstone's primary revenue source is the sale of microturbine units, subassemblies, components and various accessories. The Company also remanufactures microturbine engines for sale and provides after-market parts and services.

38. Capstone's FPP is a factory direct service offering for commissioning and post-commissioning service. Through its global distribution network, Capstone offers a comprehensive FPP for a fixed annual fee to perform regularly scheduled and unscheduled maintenance as needed. Additionally, Capstone provides factory and on-site training to certify all personnel that are allowed to perform service on its microturbines. Individuals who are certified are called Authorized Service Providers, or ASPs, and must be employed by a distributor in order to perform

work pursuant to a Capstone FPP. The majority of Capstone's distributors provide these services.

## V. DEFENDANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED GAAP BY IMPROPERLY RECOGNIZING REVENUE AND/OR FAILING TO TIMELY RECOGNIZE BAD DEBT EXPENSE

### A. Obligations Imposed by the Securities Laws and U.S. GAAP

39. The Financial Accounting Standards Board ("FASB") is the designated private sector organization for establishing standards of financial accounting that govern the preparation of financial. Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. FASB Accounting Standards Codification ("ASC") 105-10-05-1.

40. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate. Regulation S-X requires that interim

financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

### B. The Company Systematically Violated Its Own Revenue Recognition Policy As Well As GAAP Revenue Recognition Principles

41. Throughout the Class Period, the Company's revenue recognition policy remained substantially consistent. For example, Capstone's 2014 Form 10-K and 2015 Form 10-K, in relevant part, all state:

> We recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, selling price is fixed or determinable and collectability is reasonably assured. Service revenue derived from time and materials contracts is recognized as the service is performed.
>
> ***
>
> Revenue from the sale of products, parts and accessories is generally recognized and earned when all of the following criteria are satisfied: (a) persuasive evidence of a sales arrangement exists; (b) price is fixed or determinable; (c) collectability is reasonably assured; and (d) delivery has occurred. Delivery generally occurs when the title and the risks and rewards of ownership have substantially transferred to the customer.

42. The Company's revenue recognition policy tracks Staff Accounting Bulletin No. 101 ("SAB 101"), as amended by Staff Accounting Bulletin No. 104 ("SAB 104"). SAB 104, Topic 13, *Revenue Recognition*, as amended, and SAB 101, *Revenue Recognition in Financial Statements*, clearly state that revenue is

realized or realizable and earned only if and when all of the following criteria are met:

> (a) "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction;
>
> (b) "Delivery has occurred or services have been rendered;"
>
> (c) "The seller's price to the buyer is fixed or determinable;" and
>
> (d) "Collectibility is reasonably assured."

SAB 101(A)(1).

43. Additionally, FASB Statement of Concepts[5] No. 5, Recognition and Measurement in Financial Statements of Business Enterprises articulates that revenues and gains should not be recognized in financial statements until they are both earned and realizable:

> (a) "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [FASB Statement of Concepts No. 5, 83a]."
>
> (b) "Revenues are not recognized until earned. An entity's revenue-activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central

[5] FASB Statements of Financial Accounting Concepts broadly cover financial reporting concepts. FASB publishes these documents to provide a general overview of accounting concepts, definitions, and ideas guiding recognition and measurement for financial reporting purposes.

> operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues [FASB Statement of Concepts No.5, 83b]."
>
> (c) "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers [FASB Statement of Concepts No. 5, 84a]."

Moreover, if collectability is not reasonably assured, revenues should be recognized on the basis of cash received. FASB Statement of Concepts No. 5, 84g.

44. Defendants, however, failed to apply these basic accounting principles – improperly recognizing revenue on certain of its purported sales to BPC in violation of GAAP, and its stated revenue recognition policy, even though payment was not reasonably assured and the price was not fixed or determinable. Therefore, the Company's statements regarding its revenue and sales related to these transactions were false and materially misleading during much of the Class Period.

### C. The Company's Knowingly and/or Recklessly Improper Recognition of Revenue Related to "Sales" to BPC in the Company's 2014 Fiscal Fourth Quarter and 2015 Fiscal First Quarter

45. On June 12, 2014, the Company reported $36.4 million in fourth quarter revenue and $30.0 million in quarterly product revenue. The Company also reported annual revenue of $133.1 million and annual product revenue of $108.8 million for its 2014 fiscal year. Of this revenue, approximately $9.1

million resulted from purported sales to BPC during the Company's 2014 fiscal fourth quarter.[6]

46. On August 7, 2014, the Company reported $23.3 million in quarterly revenue and $17.6 million in product revenue for its 2015 fiscal first quarter. Of this revenue, approximately $3.0 million resulted from purported sales to BPC during the Company's 2015 fiscal first quarter.[7]

47. In order to recognize the revenue from these transactions, SABs 101 and 104 and the SEC Codification of Staff Accounting Bulletin, Topic 13 criterion require that "collectibility is reasonably assured" and "the seller's price to the buyer is fixed or determinable." However, Defendants' communications with the marketplace demonstrate that these requirements were not satisfied at the time the revenue at issue was recognized.

---

[6] This figure is derived from Capstone's financial statements. In the Company's 2014 Form 10-K, Capstone represented that sales to BPC accounted for 17% of the Company's revenue for the year, which equals $22.6 million in sales (17% of $133.1 million ) to BPC for the fiscal year. In the Company's Quarterly Report for the Company's 2014 fiscal third quarter, which was filed with the SEC on Form 10-Q on February 10, 2014, the Company represented that BPC had accounted for 14% of the Company's $96.6 million in sales for the first nine months, or $13.5 million. Since BPC's sales for the 2014 fiscal year were $22.6 million and BPC's sales for the first nine months of Capstone's 2014 fiscal year were $13.5 million, the Company's fourth 2014 fiscal fourth quarter sales to BPC were $9.1 million.

[7] This figure is derived from Capstone's financial statements. In the Company's Q1 2015 Form 10-Q, Capstone represented that sales to BPC accounted for 13% of the Company's revenue for the quarter.

### 1. Capstone Improperly Recognized Revenue When Collectability Was Not Reasonably Assured

48. In February of 2014, the President of Ukraine was ousted from power as protestors took control of government buildings in the capital, Kiev. Soon thereafter, troops, who were believed to be Russian special forces, took control of the region of Crimea in Ukraine, which was subsequently annexed by Russia. As the Company admitted, this led to international sanctions placed on Russia.

49. On June 12, 2014 (the start of the Class Period), Defendant Jamison, in a conference call with analysts, represented that:

> It's very important to note that we have not seen a slowdown on our Russian business. Our Russian distributor in the region, BPC Energy, has sold only 2 megawatts or roughly $2 million in the Ukraine, so overall sales have not been affected by the political unrest and is more or less business as usual.

50. Additionally, during this same conference call, Defendant Jamison, in response to a question regarding the situation in Russia and how the situation was impacting revenue for the fiscal quarter, stated:

> [O]ur business in Russia hasn't changed. Our megawatt shipments per quarter had been fairly flat the last two or three quarters, which has been good. The numbers have been up. ***Payments have been typically Russian, which can be a little bit hit or miss.*** But obviously, we've seen really no change.
>
> ***And talking to Russian distributor, he feels this is much more an American issue than a Russian issue. The sanctions that have been put in place have not impacted our business.*** And even if they did put further sanctions in place, it could take a long time before it impacted our business even if it did. So we're monitoring the situation.

> ***Obviously, we monitor any kind of geopolitical situation around the world and how it can impact our business.*** But today, as I said in my prepared remarks, our Russian business is business as usual, no changes in what we've seen in the last several years.

(Emphasis added.)

51. Moreover, during this same conference call, Defendant Jamison represented that "Russia has not slowed down despite some of the recent unsubstantiated articles."

52. Even though Defendants admitted that they were aware of sanctions placed on Russia due to its involvement in the conflict in the Ukraine and that there were articles published regarding the impact of these sanctions, Capstone immediately recognized revenue upon shipment of its products to BPC in the Company's 2014 fiscal fourth quarter and 2015 fiscal first quarter. These factors, however, demonstrate that collectibility was not reasonably assured at the time of revenue recognition.

53. The fact that Defendants admit that BPC payments were not uniform or constant further demonstrates that collectability was not reasonably assured.

54. Defendants ignored SAB 104 and Capstone's own revenue recognition policy and, in doing so, improperly recognized revenue from its transactions with BPC in the Company's 2014 fiscal fourth quarter and 2015 fiscal first quarter. For these periods, Defendants additionally violated an overarching accounting principle that revenues and gains should not be recognized in the

financial statements until they are both earned and realizable. FASB Statement of Concepts No. 5.

55. Since the collectability of revenue was not reasonably assured, Capstone was not allowed under GAAP to recognize revenue upon delivery. FASB Statement of Concepts No. 5, 84g. Therefore, Capstone should have only recognized revenue on the basis of cash received.

56. In fact, Defendants themselves later agreed with this assessment and began to ship products to BPC only upon receipt in advance of cash payment. As Defendant Jamison, in relevant part, stated in a June 15, 2015 conference call with analysts and investors, BPC is "cash up front." Moreover, in the Company's 2015 Form 10-K, Capstone explained that it was no longer willing to recognize revenue on products shipped to BPC since collectibility was not assured: "During the three months ended March 31, 2015, we shipped approximately $0.7 million of product to BPC. Given the uncertainty as to the collectability of the sale, revenue recognition on this shipment was deferred . . . . In addition, we shipped approximately $0.7 million of product to BPC during the three months ended March 31, 2015. Given the uncertainty as to the collectability of the sale, the revenue for this shipment was not recognized."

### 2. Capstone Improperly Recognized Revenue Even Though the Sales Price Was Not Fixed or Determinable

57. As outlined above, SAB 104 requires a transaction to have a "fixed or determinable sales price" in order to recognize revenue. A factor that impacts the determination of whether an arrangement is fixed or determinable is whether the customer has been granted extended payment terms. Here, Defendants concede that BPC had been granted extended payment terms.

58. As discussed above, Defendant Jamison admitted that Capstone's Russian distributors did not make payments in a regular or consistent manner: "Payments have been typically Russian, which can be a little bit hit or miss."

59. Additionally, on August 7, 2014, the Company reported its 2015 fiscal first quarter financial results. Therein, the Company disclosed that it had only collected approximately $1.6 million from BPC for the quarter. Therefore, since the Company's accounts receivable balance for BPC was $7.3 million, BPC had failed to pay for the products provided by Capstone in the 2014 fiscal fourth quarter in accordance with the Company's standard contract terms.

60. According to the Company's stated payment terms, the longest period that distributors have to make payment for products received is 90 days.[8] This is

---

[8] According to the Company's 2014 Form 10-K, Capstone's "standard terms of sales to distributors and direct end-users include transfer of title, care, custody and control at the point of shipment, payment terms ranging from full payment in advance of shipment to payment in 90 days, no right of return or exchange, and no

not what occurred here. Instead, after this 90-day period had elapsed, BPC had still not paid for the products that had been provided by Capstone in the Company's 2014 fiscal fourth quarter. Therefore, the sale price of these transactions was not fixed and determinable when revenue was recognized (upon delivery) and/or that collectibility was not reasonably assured on these transactions.

61. Moreover, the Company's DSO (Days Sales Outstanding) for BPC's (and the Company as a whole) accounts receivable greatly increased during the 2015 fiscal first quarter:[9]

| | *Q4 2014* | *Q1 2015* |
|---|---|---|
| DSO | 70 | 95 |
| BPC DSO | 72 | 259 |

62. This staggering increase in the Company's DSO for BPC's accounts receivable in the 2015 fiscal first quarter, without bringing any legal action for payment, demonstrates that Capstone was granting BPC a payment concession.

post-shipment performance obligations by Capstone except for warranties provided on the products and parts sold."

[9] Capstone discloses its DSO in its periodic reports. For example, the Company's 2014 Form 10-K, in relevant part, stated: "Days sales outstanding in accounts receivable (DSO) at the end of Fiscal 2014 was 70 days, compared with 46 days at the end of Fiscal 2013."

Plaintiffs used Capstone's financial results to calculate BPC's DSO. BPC's DSO was calculated using the same formula that Capstone used to determine its own DSO.

Since Defendants were granting payment concessions to BPC, the sales price for these transactions was not fixed and determinable. Therefore, Defendants revenue recognition on the Company's 2014 fiscal fourth quarter and 2015 fiscal first quarter BPC transactions was improper and in violation of both GAAP and the Company's stated revenue recognition policy. Additionally, this increase in BPC's DSO further demonstrates that collectability was not reasonably assured.

63. Moreover, on February 5, 2015, Defendant Jamison confirmed that BPC has "some extended payment terms which make them look like they are a larger piece of our overall receivable. That's what you're seeing there." This is further admission the original terms of the transactions with BPC at issue were above the standard 90-day period and Capstone was providing BPC a payment concession.

64. In spite of the increase in DSO, BPC's failure to pay Capstone for its purported 2014 fiscal fourth quarter sales, the fact that Capstone was providing BPC a payment concession and Defendants knew of the risks in the Russian marketplace including internationally imposed sanctions, the Company immediately recognized revenue on its purported sales to BPC in the Company's 2014 fiscal fourth quarter and 2015 fiscal first quarter. Therefore, Capstone's revenue recognition for these transactions was improper and in violation of both GAAP and the Company's stated revenue recognition policy.

### D. Capstone Violated GAAP by Overstating Capstone's Accounts Receivables

65. During the Class Period, the Company overstated its accounts receivable by failing to record an adequate allowance for doubtful accounts and failing to recognize an impairment loss. FASB Statement of Concepts No. 5 advises that a loss shall be recognized if information indicates that it is probable that an asset, such as the Company's accounts receivable, has become impaired.

66. Despite Defendants knowing that it was probable that Capstone's accounts receivable arising from its "sales" to BPC had become impaired, as BPC had failed to pay for its products in a timely manner, the Company's BPC DSO had greatly increased and payment was not probable, Capstone's allowance for doubtful accounts was inadequate; and the Company failed to recognize a proper impairment loss in the Company's 2014 Form 10-K, Q1 2015 Form 10-Q, Q2 2015 Form 10-Q, and Q3 2015 Form 10-Q. *See* ASC 310-35-10; ASC 450-20-25-2(a) ("An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: (a) Information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements…(b) The amount of loss can be reasonably estimated.").

67. On June 15, 2015, Capstone admitted that it needed to take a bad debt reserve against BPC's receivables. 2015 Form 8-K ("The Company recorded a bad debt expense of approximately $7.1 million during the fourth quarter of Fiscal 2015 against receivables owed to us by one of our Russian distributors that has been impacted by the steep decline of the Russian ruble.").

68. During the Company's June 15, 2015 conference call with analysts and investors, Defendant Brooks disclosed that the Company was taking a bad debt reserve of $7.1 million for its purported sales to BPC:

> The large year-over-year increase in SG&A expenses was primarily because of bad debt reserve of approximately $7.1 million that was recorded during the fourth quarter of fiscal 2015 against receivables owed to us by a Russian distributor, BPC Engineering, which has been impacted by the steep decline of the Russian ruble.

69. Additionally, the Company's 2015 Form 10-K, in relevant part, further explained:

> ***During the three months ended March 31, 2015, we recorded approximately $7.1 million with respect to the accounts receivable allowance from BPC. We determined that the collectability of this accounts receivable balance was not reasonably assured based on BPC's recent payment history and because the impact of the steep decline of the Russian ruble could continue to negatively impact its ability to pay its outstanding accounts receivable balance***. Also during the three months ended September 30, 2014, we recorded approximately $2.6 million with respect to the accounts receivable allowance from EMI. We determined that the collectability of this accounts receivable balance was not reasonably assured based on EMI's payment history. ***The Company recorded bad debt expense of approximately $10.1 million***, $0.2 million and $0.3 million for the years ended March 31, 2015, 2014 and 2013, respectively.

(Emphasis added.)

## E. CAPSTONE'S ADDITIONAL GAAP VIOLATIONS

70. Capstone's financial statements and its comments about the Company's financial results were false and misleading, as this financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting and disclosures about its revenues, a violation of GAAP rules.

71. Additionally, as explained above, Capstone issued financial statements that were false and misleading when originally issued since they violated the Company's stated revenue recognition policy and GAAP, including SABs 101 and 104, and FASB Statement of Concepts No. 5.

72. Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

a. The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" (FASB Statement of Concepts No. 1, 34);

b. The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those

resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, 40);

c. The principle that "financial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, 42);

d. The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" (FASB Statement of Concepts No. 1, 50);

e. The principle that "financial reporting should be reliable in that it represents what it purports to represent" (FASB Statement of Concepts No. 2, 58-59);

f. The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (FASB Statement of Concepts No. 2, 79); and

g. The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" (FASB Statement of Concepts No. 2, 95).

73. The adverse information concealed by Defendants during the period from June 12, 2014 until June 15, 2015 and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## VI. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY FALSE AND/OR MISLEADING FINANCIAL STATEMENTS

74. Capstone filed periodic reports with the SEC containing the Company's reported financial statements. Additionally, the Company issued corresponding press releases, which were attached to Form 8-K's filed with the SEC by Company, announcing the financial statements included in the Company's periodic reports.

75. All of the Company's financial statements/results issued from June 12, 2014 through June 15, 2015, including the Company's 2014 Form 10-K, Q1 2015 Form 10-Q, Q2 2015 Form 10-Q and Q3 2015 Form 10-Q, as well as financial results that were derived from those financial statements, that were discussed in those SEC filings, and discussed in the Company's press releases, including the 2014 Form 8-K, Q1 2015 Form 8-K, Q2 2015 Form 8-K and Q3 2015 Form 8-K were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules, GAAP and the Company's stated revenue recognition policy.

### A. Financial Misstatements in the Company's 2014 Fiscal Fourth Quarter and Fiscal Year Financial Results

76. On June 12, 2014, the Company filed its 2014 Form 10-K and 2014 Form 8-K. Therein, Capstone, in relevant part, reported the following financial results for the Company's 2014 fiscal year:

a. "Revenue" of $133.1 million;

b. "Product Revenue" of $108.8 million; and

c. "Accounts Receivable" of $28.0 million.

77. Additionally, therein, the Company also reported the following financial results for the Company's 2014 fiscal fourth quarter:

a. "Revenue" of $36.4 million; and

b. "Product Revenue" of $30.0 million.

78. Each of the financial results in the preceding two paragraphs was materially false and/or misleading when made because Defendants failed to disclose or indicate that : (1) that Defendants had improperly recognized revenue on its sales to BPC; (2) that the Company's revenue and accounts receivable were overstated; (3) that the Company should have been accounting for its revenue from sales to BPC on a cash basis; and (4) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

79. The misstatements/omissions alleged at ¶¶76-77, were made with scienter because:

a. The purported revenue from the sales to BPC constituted approximately 25% of the Company's total revenue for the quarter. Defendants were aware of the particulars of transactions that comprised almost a quarter of the entire Company's revenues, or if the Company's CEO and CFO were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and the Class;

b. At the time these statements were made, sales to BPC accounted for more than a quarter (26%) of the Company's accounts receivable. Defendants were aware of the particulars, including the payment terms (or lack thereof) and BPC's ability to pay for the products at issues, of the transactions that comprised such a substantial portion of the Company's accounts receivables, or if the Company's CEO and CFO were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and the Class;

c. The Company's executives were actively involved in the Company's sales efforts and were in consistent communication with BPC both prior to and during the Class Period. Due to the constant communications with BPC's representatives, the most probable inference is that the Individual

Defendants had knowledge of, or were reckless in not knowing, the nature and terms of its transactions with BPC; and

d. Defendant Jamison had to personally approve discounts of over $100,000. The transaction at issue was over $9 million. Since BPC usually received discounts of over 10%, which on a transaction of this size would be far more than $100,000, Defendant Jamison must have approved of the sale before it was booked. This supports an inference that Defendant Jamison had knowledge of, or was reckless in not knowing, the nature and terms of its transactions with BPC.

**B. Financial Misstatements in the Company's 2015 Fiscal First Quarter Financial Results**

80. On August 7, 2014, the Company filed its Q1 2015 Form 10-Q and Q1 2015 Form 8-K. Therein, Capstone, in relevant part, reported the following financial results for the Company's 2015 fiscal first quarter:

a. "Revenue" of $23.3 million;

b. "Product Revenue" of $17.6 million; and

c. "Accounts Receivable" of $24.2 million.

81. Each of the financial results in the preceding paragraph was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to BPC; (2) that the Company's revenue and accounts receivable were overstated; (3)

that the Company should have been accounting for its revenue from sales to BPC on a cash basis; and (4) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

82. The misstatements/omissions alleged at ¶80, were made with scienter for the reasons stated in ¶79, *supra*, and because:

a. The purported revenue from the sales to BPC constituted approximately 13% of the Company's total revenue for the quarter. Defendants were aware of the particulars of transactions that comprised almost a quarter of the entire Company's revenues, or if the Company's CEO and CFO were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and the Class;

b. At the time these statements were made, sales to BPC accounted for more than a third (36%) of the Company's accounts receivable. Defendants were aware of the particulars, including the payment terms (or lack thereof) and BPC's ability to pay for the products at issues, of the transactions that comprised such a substantial portion of the Company's accounts receivables, or if the Company's CEO and CFO were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and the Class; and

c. Defendant Jamison had to personally approve discounts of over $100,000. The transaction at issue was over $3 million. Since BPC usually received discounts of over 10%, which on a transaction of this size would be far more than $100,000, Defendant Jamison must have approved of the sale before it was booked. This supports an inference that Defendant Jamison had knowledge of, or was reckless in not knowing, the nature and terms of its transactions with BPC.

### C. Financial Misstatements in the Company's 2015 Fiscal Second Quarter Financial Results

83. On November 6, 2014, the Company filed its Q2 2015 Form 10-Q and Q2 2015 Form 8-K. Therein, Capstone, in relevant part, reported the following financial results for the Company's 2015 fiscal second quarter:

a. "Accounts Receivable" of $23.2 million.

84. Additionally, Capstone's Q2 2015 Form 10-Q and Q2 2015 Form 8-K, in relevant part, stated that the Company's revenue for the first six fiscal months of 2015 was $55.5 million.

85. Each of the financial results in the preceding two paragraphs was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to BPC; (2) that the Company's revenue and accounts receivable were overstated; (3) that the Company should have been accounting for its revenue from

sales to BPC on a cash basis; and (4) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

86. The misstatements/omissions alleged at ¶¶83-84, were made with scienter for the reasons stated in ¶79 and ¶82, *supra*, and because:

a. At the time these statements were made, sales to BPC accounted for 36% of the Company's accounts receivable. Defendants were aware of the particulars, including the payment terms (or lack thereof) and BPC's ability to pay for the products at issues, of the transactions that comprised such a substantial portion of the Company's accounts receivables, or if the Company's CEO and CFO were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and the Class.

### D. Financial Misstatements in the Company's 2015 Fiscal Third Quarter Financial Results

87. On February 5, 2015, the Company filed its Q3 2015 Form 10-Q and Q3 2015 Form 8-K. Therein, Capstone, in relevant part, reported the following financial results for the Company's 2015 fiscal third quarter:

a. "Accounts Receivable" of $21.6 million.

88. Additionally, Capstone's Q3 2015 Form 10-Q and Q3 2015 Form 8-K, in relevant part, stated that the Company's revenue for the first nine fiscal months of 2015 was $80.6 million.

89. Each of the financial results in the preceding two paragraphs was materially false and/or misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to BPC; (2) that the Company's revenue and accounts receivable were overstated; (3) that the Company should have been accounting for its revenue from sales to BPC on a cash basis; and (4) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy.

90. The misstatements/omissions alleged at ¶¶87-88 were made with scienter for the reasons stated in ¶79, ¶82 and ¶86, *supra*, and because:

a. At the time these statements were made, sales to BPC accounted for 38% of the Company's accounts receivable. Defendants were aware of the particulars, including the payment terms (or lack thereof) and BPC's ability to pay for the products at issues, of the transactions that comprised such a substantial portion of the Company's accounts receivables, or if the Company's CEO and CFO were unaware of these particulars, this ignorance constitutes acting

in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and the Class.

## VII. DEFENDANTS' KNOWINGLY AND/OR RECKLESSLY FALSE AND/OR MISLEADING STATEMENTS REGARDING THE COMPANY'S BACKLOG

91. Capstone reported a significant product backlog for each fiscal quarter and year during the Class Period. However, these figures were materially false and/or misleading because, as set forth herein, they were comprised of purported orders that BPC maintained purely to ensure access to lower past prices.

### A. The Company's Backlog Was Drastically Overstated During the Class Period

92. One of the metrics the Company reported on a quarterly basis was "backlog," which signified the amount of sales orders received by Capstone that had yet been fulfilled, completed or fully paid for.

93. Throughout the Class Period, as the Company failed to be profitable, Defendants continually touted the Company's backlog as the leading indicator of future performance. For example, on June 12, 2014, Defendant Reich, in a conference call with analysts and investors, in relevant part, stated: "Ending backlog is the leading indicator of our future revenue growth, and current trends bode well for our revenue and margin expansion opportunity in fiscal 2015 and beyond."

94. Analysts following Capstone likewise tracked the Company's backlog as indicative of the Company's future revenue. For example, on June 13, 2014, an analyst report issued by Roth Capital Partners, in relevant part, stated:

> Outlook. Backlog of $172mn (as of FQ4'14) serves as a proxy for CPST's NTM revenues. This implies $172mn in potential revenue during FY'15 vs. consensus of $168mn and prior ROTHe of $171mn.[10]

95. The backlog figures provided by Defendants during the Class Period, however, were materially false and/or misleading because they were overstated at all times.

96. According to Confidential Witness No. 1 ("CW1"), who was an Order Manager at Capstone from April 2001 to December 2015,[11] BPC often placed orders with Capstone for products and then failed to complete the purchases, starting as early as 2007.

97. Capstone increased its prices for its products yearly. However, according to CW1, BPC strategically used the backlog to maintain lower prices from prior years. In fact, during the Class Period, CW1 contacted BPC directly to inquire when BPC was going to take delivery of an order. According to CW1,

---

[10] "NTM revenue" refers to a company's revenue over the next twelve months (NTM) of operations.

[11] During the Class Period, CW1 reported to the Company's SIOP manager, Doug Fredriksen, who in turn reported to Richard Lewis, Capstone's Vice President of Operations.

BPC informed CW1 that they "didn't want to delete or cancel" the order since "they wanted to keep [the items] in backlog to have the old price, and sales didn't stop them from doing that."

98. According to CW1, while other distributors ended up backlogged on occasion as well, usually when projects or permits took longer than expected, BPC was the only distributor that used the backlog to maintain lower prices.

99. Furthermore, CW1 stated that BPC's orders used to maintain lower prices made up a significant portion of BPC's backlog, and BPC's backlog was a significant portion of the Company's overall backlog since BPC always had the largest amount of orders in the backlog.[12]

100. CW1 confirmed that in 2015 BPC still had orders in the Company's system dating back to 2007 and 2008.[13]

101. According to CW1, in March 2015, BPC informed Capstone that they were going to have to downsize a large order of products. This order contained at least two of the Company's C1000 turbines, which alone cost over a million

---

[12] As CW1 explained: "BPC had a large amount of orders on backlog, period. Anyone else was short backlog based on projects, BPC was the one always with the long backlog. When we would get the order you're thinking to yourself, 'are they really going to [complete this transaction]?'").

[13] For an order to be removed from the backlog, CW1's supervisor had to get permission from Executive Vice President of Sales & Marketing Jim Crouse. According to CW1, Crouse typically requested that the backlog order, including the ones from 2007 and 2008, not be deleted.

dollars, and other large products. Capstone had already manufactured these products.

102. Capstone itself confirmed this fact when it announced on March 2, 2016 that a new order to BPC is "the first to be shipped to BPC Engineering since March 2015."

103. Even though the backlog contained purported orders from BPC that were almost a decade old and were kept active purely so that BPC had access to cheaper products, and BPC had cancelled a large order of turbines from Capstone in March 2015, the Company did not remove BPC's purported orders from the backlog until November 5, 2015.

104. Additionally, on June 15, 2015, Defendant Jamison, in a conference call with analysts and investors, in response to a question regarding BPC's percentage of Capstone's backlog, in relevant part, stated:

> Let's talk about BPC in general. We took a very large AR hit this quarter that is a reserve not a write-off which is there's obviously a very big difference. We thought it was the prudent thing to do in working with our auditors and the way to properly reflect the risk in the business and the lack of visibility that we have.

105. That the Company's auditors required Capstone to reserve against the Company's accounts receivable due to the risk of non-payment from BPC further demonstrates that the Company lacked a reasonable basis for its continued placement of tens of millions of dollars in purported orders from BPC on its

backlog.

106. On November 5, 2015, the Company finally disclosed that it had removed "approximately $52.4 million for 200 units, or 64.5 megawatts, from BPC Engineering ("BPC"), one of the Company's Russian distributors."

**B. Defendants Made Materially False and Misleading Statements Concerning the Company's Backlog During the Class Period**

107. On June 12, 2014, the Company's 2014 Form 8-K, in relevant part, stated:

> ***Record Backlog of $171.6 Million at End of Fiscal 2014***
>
> ***
>
> - Record product backlog of $171.6 million at March 31, 2014, up 15% year-over-year
> - Record Factory Protection Plan backlog of $47.2 million at March 31, 2014, up 35% year-over-year
>
> President and Chief Executive Officer Darren Jamison commented, "Capstone achieved another banner year for business development and margin expansion in Fiscal 2014, ending the year with record quarterly product revenue and the second highest quarter for total revenue in company history. We also set new annual records for revenue and gross margin while entering Fiscal 2015 with solid backlog of $171.6 million, also a company record.

108. Additionally, on June 12, 2014, the Company's 2014 Form 10-K, in relevant part, stated:

> Total backlog as of March 31, 2014 increased $22.7 million, or 15%, to $171.6 million from $148.9 million at March 31, 2013. As of March 31, 2014, we had 820 units, or 188.2 megawatts, in total backlog compared to 816 units, or 162.8 megawatts, at the same date last year.

***

> During Fiscal 2014, we booked orders for 135.3 megawatts and shipped 109.9 megawatts of products, which combined with our backlog at March 31, 2013, resulted in 188.2 megawatts in backlog at the end of the fiscal year.

109. As discussed herein and as Defendants' later admitted by removing more than $52 million for 200 units (or 64.5 megawatts) from the backlog, these statements were materially false and/or misleading when made, or Defendants omitted material facts necessary to make the statements not misleading, because the Company's backlog figures were overstated.

110. The misstatements/omissions alleged at ¶¶107-08 were made with scienter because:

a. At the time these statements were made, purported sales to BPC comprised were the largest component of the Company's backlog. Defendants were aware of the nature of BPC's purported sales orders on the backlog, including that BPC was using the backlog to maintain previous lower prices and that some of these purported sales were almost a decade old, or if the Company's CEO and CFO were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and the Class; and

b. The Company's executives were actively involved in the Company's sales efforts and were in consistent communication with BPC both prior to and during the Class Period. Due to the consistent communications with BPC's representatives, the most probable inference is that the Individual Defendants had knowledge of, or were reckless in not knowing, that BPC was using the backlog to maintain previous lower prices and that some of these purported sales were almost a decade old.

111. On August 7, 2014, the Company's Q1 2015 Form 8-K, in relevant part, stated:

> **Record Product Backlog of $175.2 Million at June 30, 2014**
>
> ***
>
> - Product backlog of $175.2 million at June 30, 2014
>
> ***
>
> Capstone's backlog as of June 30, 2014 was $175.2 million, compared to $171.6 million at March 31, 2014, and $155.8 million at June 30, 2013.

112. Additionally, on August 7, 2014, the Company's Q1 2015 Form 10-Q, in relevant part, stated:

> Total backlog as of June 30, 2014 increased $19.4 million, or 12%, to $175.2 million from $155.8 million as of June 30, 2013. As of June 30, 2014, we had 852 units, or 190.2 megawatts, in total backlog compared to 798 units, or 170.0 megawatts, at the same date last year.

113. As discussed herein and as Defendants' later admitted by removing more than $52 million for 200 units (or 64.5 megawatts) from the backlog, these statements were materially false and/or misleading when made, or Defendants omitted material facts necessary to make the statements not misleading, because the Company's backlog figures were overstated.

114. The misstatements/omissions alleged at ¶¶111-12 were made with scienter for the reasons stated in ¶110, *supra*.

115. On November 6, 2014, the Company's Q2 2015 Form 8-K, in relevant part stated:

> ● Product backlog of $172.3 million at September 30, 2014
> ● Cash balance of $40.8 million at September 30, 2014
>
> President and Chief Executive Officer Darren Jamison commented, "The second quarter of Fiscal 2015 was a vast improvement over the first quarter in terms of the timing of shipments and overall sales volume and revenue. Gross margin increased 240 basis points year-over-year despite softer revenue, a direct result of the substantial operational improvements we are continuing to make to reduce our manufacturing costs. Backlog remains high, which is a key leading indicator of future revenue. Based on our order flow and pipeline, we believe that we will return to year-over-year revenue growth and advance toward profitability in the second half of Fiscal 2015, typically our strongest quarters of the year."
>
> ***
>
> Capstone's backlog as of September 30, 2014 was $172.3 million, compared to $175.2 million at June 30, 2014, and $149.8 million at September 30, 2013.

116. Additionally, on November 6, 2014, the Company's Q2 2015 Form 10-Q, in relevant part, stated:

> Total backlog as of September 30, 2014 increased $22.5 million, or 15%, to $172.3 million from $149.8 million as of September 30, 2013. As of September 30, 2014, we had 884 units, or 186.8 megawatts, in total backlog compared to 775 units, or 161.1 megawatts, at the same date last year.

117. As discussed herein and as Defendants' later admitted by removing more than $52 million for 200 units (or 64.5 megawatts) from the backlog, these statements were materially false and/or misleading when made, or Defendants omitted material facts necessary to make the statements not misleading, because the Company's backlog figures were overstated.

118. The misstatements/omissions alleged at ¶¶115-16 were made with scienter for the reasons stated in ¶110 and ¶114, *supra*.

119. On February 5, 2015, the Company's Q3 2015 Form 8-K, in relevant part, stated:

> - Record product backlog of $175.5 million and record Factory Protection Plan (FPP) backlog of $61.0 million as of December 31, 2014
>
> ***
>
> Capstone's product backlog as of December 31, 2014 was $175.5 million, compared to $172.3 million at September 30, 2014, and $160.4 million at December 31, 2013.

120. Additionally, on February 5, 2015, the Company's Q3 2015 Form 10-Q, in relevant part, stated:

> Total backlog as of December 31, 2014 increased $15.1 million, or 9%, to $175.5 million from $160.4 million as of December 31, 2013. As of December 31, 2014, we had 857 units, or 192.1 megawatts, in total backlog compared to 722 units, or 178.4 megawatts, at the same date last year.

121. As discussed herein and as Defendants' later admitted by removing more than $52 million for 200 units (or 64.5 megawatts) from the backlog, these statements were materially false and/or misleading when made, or Defendants omitted material facts necessary to make the statements not misleading, because the Company's backlog figures were overstated.

122. The misstatements/omissions alleged at ¶¶119-20 were made with scienter for the reasons stated in ¶110 and ¶114, *supra*.

123. On June 15, 2015, the Company's 2015 Form 8-K, in relevant part, stated:

> Capstone's product backlog as of March 31, 2015 was $165.7 million, compared to $175.5 million at December 31, 2014, and $171.6 million at March 31, 2014.

124. Additionally, on June 15, 2015, the Company's 2015 Form 10-K, in relevant part, stated:

> Total backlog as of March 31, 2015 decreased $5.9 million, or 3%, to $165.7 million from $171.6 million at March 31, 2014. As of March 31, 2015, we had 787 units, or 182.8 megawatts, in total

> backlog compared to 820 units, or 188.2 megawatts, at the same date last year. The decrease in backlog was primarily the result of the downturn of the oil markets, a substantially stronger U.S. dollar making our products more expensive overseas and on-going geopolitical tensions in Russia, North Africa and the Middle East.

125. On June 15, 2015, on a conference call with investors and analysts, Defendant Jamison in response to an analyst's question, in relevant part, stated:

> [Analyst]: Hey. Maybe you can start with backlog, just wondering if you've some comments on the health of backlog. I'm sure you've scrubbed it. But is this something we're going forward given your headwinds I mean thinking about cancellations potentially or I mean, is this still more about just timing push out?
>
> [Defendant Jamison]: Yeah. No, great question. We have scrubbed it very hard. We've seen very little cancellations in the last two quarters, especially in Q4. We do believe that there is – we'll continue to see some push outs, but I think we're encouraged with the stabilization of crude oil prices and in the ruble that we're going to see some acceleration of that backlog going forward.
>
> So I think as we look at it, we kind of believe that we are through the worst of it and that we'll come out the other side of the trough especially in Q1 and Q2 and look for a strong second half of the year. So we don't see any reason to modify the backlog and again have not seen any recent cancellations.

126. As discussed herein and as Defendants' later admitted by removing more than $52 million for 200 units (or 64.5 megawatts) from the backlog, these statements were materially false and/or misleading when made, or Defendants omitted material facts necessary to make the statements not misleading, because the Company's backlog figures were overstated.

127. The misstatements/omissions alleged at ¶¶123-25 were made with scienter for the reasons stated in ¶110 and ¶114, *supra*, and because:

a. As discussed herein, at the time these statements were made, the Company had already stopped shipping products to BPC, BPC had cancelled a large order from Capstone and Defendants had determined that future transactions with BPC should only be accounted for on a cash basis. Defendants' admitted knowledge of these facts supports an inference that the Individual Defendants had knowledge of, or were reckless in not knowing, that the backlog was overstated due to its improper inclusion of certain BPC "sales"; and

b. According to Defendants, the Company had conducted a review of its backlog and determined that its backlog was accurate and that it was unnecessary to remove any of BPC's backlog. Such a review should have uncovered that the Company's backlog contained almost decade-old "sales" to BPC and that the backlog was overstated due to BPC's desire to maintain the ability to purchase products at lower prices. The only reasonable inference that can be made from the fact that this investigation failed to uncover that the Company's backlog was overstated – even though the Company itself announced the removal of ***52.4 million of backlog for BPC Engineering less than six months later*** – is that the Individual Defendants had knowledge of, or were reckless in not

knowing, that the backlog was overstated due to its improper inclusion of certain BPC "sales."

128. On August 6, 2015, the Company's Q1 2016 Form 8-K, in relevant part, stated:

> Total backlog as of June 30, 2015 was $160.5 million compared with $175.2 million as of June 30, 2014, and $165.7 million as of March 31, 2015.

129. Additionally, on August 6, 2015, the Company's Q1 2016 Form 10-Q, in relevant part, stated:

> Total backlog as of June 30, 2015 decreased $14.7 million, or 8%, to $160.5 million from $175.2 million as of June 30, 2014. As of June 30, 2015, we had 792 units, or 176.6 megawatts, in total backlog compared to 852 units, or 190.2 megawatts, at the same date last year. The decrease in backlog was primarily the result of the softness of the global oil and gas market, a substantially stronger U.S. dollar (making our products more expensive overseas) and on-going geopolitical tensions in Russia, North Africa and the Middle East as experienced throughout Fiscal 2015.

130. As discussed herein and as Defendants' later admitted by removing more than $52 million for 200 units (or 64.5 megawatts) from the backlog, these statements were materially false and/or misleading when made, or Defendants omitted material facts necessary to make the statements not misleading, because the Company's backlog figures were overstated.

131. The misstatements/omissions alleged at ¶¶128-29 were made with scienter for the reasons stated in ¶110, ¶114 and ¶127, *supra*.

## VIII. THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING SARBANES-OXLEY CERTIFICATIONS

132. Each of Capstone's financial statements issued during the Class Period, contained substantially similar Sarbanes-Oxley Required Certifications, signed by the Individual Defendants, who certified:

> 1. I have reviewed this report on Form 10-K of Capstone Turbine Corporation;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiary, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to

be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

133. These statements made in the 2014 Form 10-K, Q1 2015 Form 10-Q, Q2 2015 Form 10-Q, and Q3 2015 Form 10-Q were materially false and/or

misleading when made because Defendants failed to disclose or indicate: (1) that Defendants had improperly recognized revenue on its sales to BPC; (2) that the Company's revenue and accounts receivable were overstated; (3) that the Company should have been accounting for its revenue from sales to BPC on a cash basis; (4) that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP and the Company's stated revenue recognition policy; and (5) that the Company's backlog figures were overstated.

134. These statements made in the 2014 Form 10-K, Q1 2015 Form 10-Q, Q2 2015 Form 10-Q, Q3 2015 Form 10-Q, 2015 Form 10-K, Q1 2016 Form 10-Q, and Q2 2016 Form 10-Q were materially false and/or misleading when made because Defendants failed to disclose or indicate that the Company's backlog figures were overstated.

## IX. LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD

135. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

136. During the Class Period, as a result of the open, well-developed, and efficient market for Capstone's securities, the prices of Capstone's securities fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed

to investors and the artificial inflation was removed over time from the price of Capstone's securities. Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Capstone's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

137. The truth regarding Capstone's financial condition was partially revealed, and/or the concealed risks materialized, on or about: August 7, 2014; June 15, 2015; October 1, 2015; and November 5, 2015. As a direct result of these partial disclosures, the price of Capstone's stock declined precipitously on heavy trading volume.

138. On August 7, 2014, the Company issued a press release entitled, "Capstone Turbine Announces First Quarter Fiscal Year 2015 Operating Results; Record Product Backlog of $175.2 Million at June 30, 2014." Therein, the Company, in relevant part, stated:

> CHATSWORTH, Calif., Aug. 7, 2014 (GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq:CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the first quarter of fiscal year 2015 ended June 30, 2014.
>
> **First Quarter 2015 Highlights**

- Revenue of $23.3 million, product revenue of $17.6 million
- Gross margin of $3.4 million, or 15% of revenue
- Product backlog of $175.2 million at June 30, 2014
- Cash balance of $46.7 million at June 30, 2014

President and Chief Executive Officer Darren Jamison commented, "Lower than expected revenue and excess finished goods for the first quarter were due to delayed shipment requests for the delivery and installation of equipment on project sites. The timing fluctuations were not the result of any pattern of project cancellations or postponements by customers, but instead reflect the inconsistent nature of our business on a quarter-to-quarter basis. Gross margin showed a modest increase year-over-year despite the softer revenue level, which demonstrates the operating and direct material cost improvements that we have made to our manufacturing processes. Our pipeline remains stronger than ever as a result of the long-term secular trends driving the markets for distributed power generation. With another record high for backlog set at the end of the first quarter, we expect to be able to make up the first quarter shortfall in revenue throughout the remainder of Fiscal 2015 as we drive our business toward profitability."

**First Quarter 2015 Financial Summary**

Revenue for the first quarter of Fiscal 2015 was $23.3 million, compared to $36.4 million for the fourth quarter of Fiscal 2014, and $24.4 million for the first quarter of Fiscal 2014.

Capstone's backlog as of June 30, 2014 was $175.2 million, compared to $171.6 million at March 31, 2014, and $155.8 million at June 30, 2013.

Gross margin for the first quarter of Fiscal 2014 was $3.4 million, or 15% of revenue, compared to $6.1 million, or 17% of revenue, for the fourth quarter of Fiscal 2014, and $3.3 million, or 14% of revenue, for the first quarter of Fiscal 2014.

> Research and development expenses were $2.3 million for the first quarter of Fiscal 2015, compared to $2.5 million for the fourth quarter of Fiscal 2014, and $2.3 million for the first quarter of Fiscal 2014.
>
> Selling, general and administrative expenses were $7.8 million for the first quarter of Fiscal 2015, compared to $6.8 million for the fourth quarter of Fiscal 2014 and $7.6 million for the first quarter of Fiscal 2014.
>
> Capstone's net loss was $6.8 million, or $0.02 loss per share, for the first quarter of Fiscal 2015, compared to a net loss of $3.4 million, or $0.01 loss per share, for the fourth quarter of Fiscal 2014, and a net loss of $6.8 million, or $0.02 loss per share, for the first quarter of Fiscal 2014. Capstone's loss from operations for the first quarter of Fiscal 2015 was $6.7 million, compared to $3.1 million for the fourth quarter of Fiscal 2014, and $6.6 million for the first quarter of Fiscal 2014.
>
> **Liquidity and Capital Resources**
>
> At June 30, 2014, cash and cash equivalents totaled $46.7 million, compared to $27.9 million at March 31, 2014, and $21.6 million at June 30, 2013.
>
> During the quarter ended June 30, 2014, cash used in operating activities was $9.1 million and capital expenditures totaled $0.2 million. This compares to cash used in operating activities of $15.9 million and $0.3 million in capital expenditures during the quarter ended June 30, 2013.

139. Additionally, on August 7, 2014, the Company filed with the SEC its Q1 2015 Form 10-Q. Therein, the Company disclosed, amongst others, that it had only collected approximately $1.6 million from BPC for the quarter, the Company's DSO was increasing (as well as the DSO for BPC's receivables), and Capstone's accounts receivables were $24.2 million.

140. Moreover, on August 7, 2014, Defendant Jamison, during a conference call with analysts and investors, in relevant part, stated:

> As a global company, we continuously monitor the changing geopolitical environments in areas in which Capstone is doing business or has plans to do business. More specifically, we are focused on Russia, the Middle East, Iraq, Isreal, and Africa. The largest potential impact of our current business is definitely Russia and the ongoing tensions in Ukraine.

141. On this news, shares of Capstone declined $4.40 per share, or 15.5%, to close at $24.00 per share on August 8, 2014, on unusually heavy volume.

142. On June 15, 2015, the Company issued a press release entitled, "Capstone Turbine Announces Fourth Quarter and Fiscal Year 2015 Operating Results." Therein, the Company, in relevant part, stated:

> CHATSWORTH, Calif., June 15, 2015 (GLOBE NEWSWIRE) -- Capstone Turbine Corporation (Nasdaq:CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the fourth quarter and fiscal year ended March 31, 2015.
>
> Highlights
>
> - Gross margin of $18.3 million, or 16% of revenue, for Fiscal 2015
> - Gross margin as a percentage of revenue flat compared to Fiscal 2014 despite a 13% decline in revenue, reflecting operational improvements to the cost structure
> - Accessories, parts and service revenue up 7%
> - Factory Protection Plan (FPP) backlog of $61.2 million as of March 31, 2015
> - Cash balance of $32.2 million as of March 31, 2015

President and Chief Executive Officer Darren Jamison commented, "In Fiscal 2015, Capstone adapted to challenging global and economic market dynamics in ways that have made us a more resilient company today and for the future. We continued to make significant progress in strengthening our company by further diversifying our business, growing and maturing our distribution network, improving our product reliability, expanding into promising new geographies, and implementing cost savings. However, our progress was eclipsed by headwinds from the dramatic downturn of the oil markets, a substantially stronger U.S. dollar making our products more expensive overseas, and on-going geopolitical tensions in Russia, North Africa and the Middle East. These conditions impacted our business in Fiscal 2015, but they also prompted us to closely evaluate areas of our business that are within our control. As a result, we have taken decisive actions that ultimately have made Capstone stronger, leaner, more flexible and better positioned for growth than ever before. We look forward to regaining our growth momentum over the next year ahead."

**Fourth Quarter 2015 Financial Summary**

Revenue for the fourth quarter of Fiscal 2015 was $29.9 million, compared to $30.1 million for the third quarter of Fiscal 2015, and $36.4 million for the fourth quarter of Fiscal 2014.

Capstone's product backlog as of March 31, 2015 was $165.7 million, compared to $175.5 million at December 31, 2014, and $171.6 million at March 31, 2014.

Gross margin for the fourth quarter of Fiscal 2015 was $3.5 million, or 11.8% of revenue, compared to $6.1 million, or 20.3% of revenue, for the third quarter of Fiscal 2015, and $6.1 million, or 16.9% of revenue, for the fourth quarter of Fiscal 2014. Gross margin for the fourth quarter of Fiscal 2015 was impacted by a $1.2 million non-cash charge for slow-moving inventory related to the Company's waste heat recovery generator product. In addition, cost of goods sold for the quarter included $0.7 million of product shipped without recognizing the associated revenue. Without these two items, gross margin for the fourth quarter of 2015 would have been $5.4 million, or 18.0% of revenue.

Research and development expenses were $2.9 million for the fourth quarter of Fiscal 2015, compared to $2.4 million for the third quarter of Fiscal 2015, and $2.5 million for the fourth quarter of Fiscal 2014.

Selling, general and administrative expenses were $14.7 million for the fourth quarter of Fiscal 2015, compared to $7.5 million for the third quarter of Fiscal 2015 and $6.8 million for the fourth quarter of Fiscal 2014. The Company recorded a bad debt expense of approximately $7.1 million during the fourth quarter of Fiscal 2015 against receivables owed to us by one of our Russian distributors that has been impacted by the steep decline of the Russian ruble. In comparison, the Company had no such expense of this magnitude during the third quarter of 2015 or fourth quarter of 2014.

Capstone's net loss was $14.3 million, or $0.05 loss per share, for the fourth quarter of Fiscal 2015, compared to a net loss of $3.9 million, or $0.01 loss per share, for the third quarter of Fiscal 2015, and a net loss of $3.4 million, or $0.01 loss per share, for the fourth quarter of Fiscal 2014. Capstone's loss from operations for the fourth quarter of Fiscal 2015 was $14.1 million, compared to $3.8 million for the third quarter of Fiscal 2015, and $3.1 million for the fourth quarter of Fiscal 2014.

**Fiscal Year 2015 Financial Summary**

Revenue for Fiscal 2015 was $115.5 million, compared to $133.1 million for Fiscal 2014.

Fiscal 2015 gross margin was $18.3 million, or 16% of revenue, compared to Fiscal 2014 gross margin of $21.7 million, or 16% of revenue. While annual revenue decreased 13%, gross margin percentage was flat compared to Fiscal 2014. The change in gross margin dollars was driven by multiple factors, including lower royalty expense of $1.2 million, lower production and service center labor and overhead expense of $1.0 million and lower warranty expense of $0.4 million. The positive impact of these factors was offset by the adverse impact of lower volume, lower average selling prices and a change in product mix of $5.0 million, and higher inventory charges of $1.0 million.

Research and development expenses were $9.7 million for Fiscal 2015, compared to $9.0 million for Fiscal 2014. Benefits from cost-sharing programs decreased by approximately $0.9 million to $0.5 million in Fiscal 2015 from $1.4 million in Fiscal 2014. In addition, professional services expense decreased by $0.2 million in Fiscal 2015 as compared to the previous year.

Selling, general and administrative expenses were $39.5 million for Fiscal 2015, compared to $28.0 million for Fiscal 2014. The net increase in SG&A expenses was comprised of a $9.9 million increase in bad debt reserve (of which $7.1 million was recorded in the fourth quarter of Fiscal 2015 as referenced above) along with increases in salaries, professional services, marketing and business travel expense, partially offset by a decrease in facilities and supplies expense.

Net loss was $31.5 million, or a $0.10 loss per share, for Fiscal 2015, compared to a net loss of $16.3 million, or a $0.05 loss per share, for Fiscal 2014. Capstone's loss from operations was $30.9 million for Fiscal 2015, compared to a loss from operations of $15.3 million for Fiscal 2014.

**Liquidity and Capital Resources**

At March 31, 2015, cash and cash equivalents totaled $32.2 million, compared to $40.9 million at December 31, 2014, and $27.9 million at March 31, 2014.

During the quarter ended March 31, 2015, cash used in operating activities was $6.6 million and capital expenditures totaled $0.4 million. This compares to cash used in operating activities of $3.8 million and $0.4 million in capital expenditures during the quarter ended March 31, 2014.

During Fiscal 2015, Capstone used $23.0 million of cash in operating activities and spent $1.6 million in capital expenditures. This compares to cash used in operating activities of $15.4 million and $1.2 million in capital expenditures during Fiscal 2014.

143. Additionally, the Company's 2015 Form 10-K filed with the SEC on the same day, in relevant part, stated:

> ***During the three months ended March 31, 2015, we recorded approximately $7.1 million with respect to the accounts receivable allowance from BPC. We determined that the collectability of this accounts receivable balance was not reasonably assured based on BPC's recent payment history and because the impact of the steep decline of the Russian ruble could continue to negatively impact its ability to pay its outstanding accounts receivable balance***. Also during the three months ended September 30, 2014, we recorded approximately $2.6 million with respect to the accounts receivable allowance from EMI. We determined that the collectability of this accounts receivable balance was not reasonably assured based on EMI's payment history. ***The Company recorded bad debt expense of approximately $10.1 million***, $0.2 million and $0.3 million for the years ended March 31, 2015, 2014 and 2013, respectively. (Emphasis added.)

144. Additionally, during a conference call with investors and analysts on June 15, 2015, Defendant Brooks, in relevant part, stated:

> The large year-over-year increase in SG&A expenses was primarily because of bad debt reserve of approximately $7.1 million that was recorded during the fourth quarter of fiscal 2015 against receivables owed to us by a Russian distributor, BPC Engineering, which has been impacted by the steep decline of the Russian ruble.

145. Moreover, during this same conference call, Defendant Jamison, in relevant part, stated:

> …let's talk about BPC in general. We took a very large AR hit this quarter that is a reserve not a write-off which is there's obviously a very big difference. We thought it was the prudent thing to do in working with our auditors and the way to properly reflect the risk in the business and the lack of visibility that we have.

> That being said, they've made some payments already in the first quarter. We expect more payments by the end of June. We expect to reverse some of the product that we shipped and take revenue on it last quarter as well as probably get some recovery on the bad debt reserve. That should happen each quarter going forward. They are in cash up front, but again, this is a fairly large distributor.

146. On this news, shares of Capstone declined $1.81 per share, or 16.1%, to close at $9.40 per share on June 16, 2015, on unusually heavy volume.

147. On October 1, 2015, the Company issued a press release entitled, "With Shipments Delayed Until Fiscal Third Quarter Capstone Expects Fiscal Second Quarter Financial Results To Be Below Expectations." Therein, the Company, in relevant part, stated:

> CONTINUED HEADWINDS IN OIL AND GAS MARKET AND STRONG U.S. DOLLAR IMPACT REVENUE
>
> CHATSWORTH, Calif., Oct. 1, 2015 (GLOBE NEWSWIRE) -- Capstone Turbine Corporation (www.capstoneturbine.com) (Nasdaq:CPST), the world's leading clean technology manufacturer of microturbine energy systems, announced today that its preliminary second quarter earnings were notably below management's expectations and analysts' consensus estimates as continued headwinds in the oil and gas market and a strong U.S. dollar delayed orders and shipments in the quarter.
>
> "We have approximately 75 microturbines totaling over 13MW for customers in finished goods as of September 30th that were slotted to ship in the quarter that will now ship next quarter," said Jim Crouse, Executive Vice President of Sales and Marketing at Capstone Turbine. "The Capstone sales team will be working diligently to get these units delivered as quickly as possible and drive for a strong rebound in the third quarter, which is historically our strongest quarter in the fiscal year," added Crouse.

> After posting the second best first quarter in company history, which was an increase of 16% year-over-year, and a 200 basis point improvement in margin, Capstone experienced a significant slowdown in both product shipments and new order flow in the most recent quarter ended September 30, 2015. ***In addition, the Company received no significant payments from its Russian distributor, who until recently was one of their largest customers.***
>
> As a result of the lower than expected revenue and increased inventory levels, cash burn for the quarter was higher than anticipated prompting management to look at additional areas within the business where operating expenses can be immediately reduced. Management has therefore decided to indefinitely postpone an upcoming employee merit increase, cut hourly overtime, eliminate temporary employees and convert all variable cash compensation to stock grants. These actions are in addition to the recent flattening of the Capstone executive organizational structure which eliminated three executive positions back in April 2015. These most recent actions combined with the April restructuring will save approximately $3.3 million in cash annually.
>
> "Companies across the energy space are seeing significant market headwinds with the precipitous drop in oil prices, commodity prices and the strong U.S. dollar," said Darren Jamison, Capstone's President and Chief Executive Officer. "In response to the ongoing market slowdown we are taking a three pronged strategy. First, we are looking for every way possible to lower our operating expenses without impacting our brand or total customer satisfaction. Second, we will continue to make improvements to our products in order to have them be more competitive and cost effective in the growing combined heat and power (CHP) space. These product changes will be unveiled at the upcoming PowerGen International Show on December 8th in Las Vegas, Nevada. Lastly, the Company is looking to grow its business in Latin America, Australia, Africa and the Middle East. These markets have tremendous potential and will give us an ability to offset the slowdown we are experiencing in the energy space and more specifically in Russia," added Jamison.

(Emphasis added.)

148. On this news, shares of Capstone declined $1.74 per share, or 25.5% to close at $5.06 per share on October 1, 2015 on unusually heavy volume. The stock price continued to decline, falling by $0.24, or 4.8%, to close at $4.82 per share on October 2, 2015, and another $0.42, or 8.7% , to close at $4.40 per share on October 5, 2015, on heavy volume.

149. On November 5, 2015, the Company issued a press release entitled, "Capstone Turbine Reports Second Quarter of Fiscal 2016 Financial Results." Therein, the Company, in relevant part, stated:

> CHATSWORTH, Calif., Nov. 5, 2015 (GLOBE NEWSWIRE) -- Capstone Turbine Corporation (www.capstoneturbine.com) (Nasdaq:CPST), the world's leading clean technology manufacturer of microturbine energy systems, reported financial results for its second quarter of fiscal 2016 ended September 30, 2015.
>
> Financial results are in line with the Company's revised expectations announced on October 1, 2015. Total revenue for the second quarter of 2016 was $17.9 million, and net loss was $7.9 million or $0.02 per share.
>
> Darren Jamison, President and Chief Executive Officer of Capstone Turbine, said, "As disappointed as we are in reporting financial results that were below our original internal and Street expectations, we are taking actions to expedite the shipment of orders that were left in finished goods from the second quarter and have accelerated our initiative to lower our cash burn by continuing to reduce our overall operating expenses."
>
> The Company expects that its recent accelerated strategic initiatives, combined with its earlier actions this year to flatten the organization and its other ongoing cost-cutting measures, will result in lowering the overall quarterly EBITDA breakeven level from approximately $40

million in revenue per quarter to $30 million per quarter by April 2016, the beginning of its first quarter of fiscal 2017. Average revenue for the Company over the last 18 quarters was approximately $30 million, with revenue exceeding that level nine times and reaching at least $27 million, 13 out of the last 18 quarters. Based upon the new cost structure, which will reduce expenses by 25%, the Company would have been breakeven or very close 13 of the last 18 quarters.

"As we wind down the final development efforts of the C200/C1000 program, and as our distribution channel matures, we approach the point where we can reduce our R&D and SG&A spend substantially going into the next fiscal year. We believe that this lower cost structure will allow us to size the business to essentially breakeven at revenue levels that we have hit many times before and will allow us to quickly reduce our cash usage next year," added Jamison.

The Company's three-pronged profit strategy is to first look for every way possible to lower operating expenses and "lean out" the organization without impacting brand or total customer satisfaction. Second, the Company plans to finalize the C200 and C1000 product improvements in order to make them more competitive and cost-effective in the growing combined heat and power (CHP) space. These product changes will be unveiled at the upcoming PowerGen International Show on December 8, 2015 in Las Vegas, Nevada. Third, the Company turned its focus on growing market adoption in Latin America, Australia, Africa and the Middle East, as these markets have tremendous potential and can offset the slowdown the Company is experiencing in the energy space and, more specifically, in Russia.

"We are making progress with geographical and industry diversification by working closely with our distributors. We continue to seek out new opportunities as we invest our time and resources in educating potential customers about Capstone's value proposition, specifically within the emerging markets of Australia, Latin America, Africa and the Middle East. During the second quarter, we dramatically increased our presence in Australia as that market contributed to approximately 30% of sales. The energy efficiency market was strong this quarter and comprised 68% of our sales, and

natural resources applications accounted for 26% of sales," Mr. Jamison continued.

"We still have challenges ahead from the continued economic headwinds, the strong U.S. dollar and the drop in oil and commodity prices. However, with a new lower cost structure, improved CHP product offerings and increased sales efforts in emerging markets, we believe we will be able to overcome these challenges and improve our financial results throughout the upcoming year. Further, as a result of our initiatives, we expect to be better positioned for sustainable growth when oil prices rebound and the dollar weakens, " Mr. Jamison concluded.

**Business Highlights Include:**

- CHP/energy efficiency comprised 68% of shipments in the second quarter, with 26% of shipments being used in natural resource applications.

Orders received this quarter included:

- ○ Two C1000 microturbine follow-on orders for Eagle Ford Shale in Texas.
- ○ C1000 to Kineticor Resource Corporation for Canadian flare gas utilization.
- ○ Two C600s to provide clean power for oil field project in Alaska.
- ○ C600 microturbine to power oil processing equipment and electrical submersible pumps on an oil platform off the western coast of Africa.
- ○ C600 microturbine follow-on order to upgrade a new commercial building in Melbourne, Australia, as part of Walker Corporation's flagship Collins Square project in the city's Central Business District (CBD).
- ○ C1000 microturbine to upgrade a processing plant for an Italian silica plant.

**Financial Highlights of Second Quarter of Fiscal 2016 Include:**

- ***Total revenue of $17.9 million compared with $32.2 million in the year-ago second quarter. This quarter's results did not include any orders from Russia, which contributed $6.7 million in revenue during last year's second quarter.***
- ***Total backlog as of September 30, 2015 was $104.8 million compared with $172.3 million as of September 30, 2014 and $160.5 million as of June 30, 2015. The Company removed $52.4 million from backlog from BPC Engineering, its Russian distributor, this quarter.***
- Selling, General & Administrative expenses for the second quarter of fiscal 2016 were $6.7 million compared with $9.5 million in the year-ago second quarter.
- Net loss for the second quarter was $7.9 million or $0.02 per share, compared with a net loss of $6.5 million or $0.02 per share in the year-ago second quarter.
- Cash and cash equivalents as of September 30, 2015 was $10.6 million ($15.6 million when combined with restricted cash of $5.0 million related to the credit facility).

(Emphasis added.)

150. Additionally, on November 5, 2015, the Company filed its Q2 2016 Form 10-Q that, in relevant part, stated:

> *Backlog*
>
> During the three months ended September 30, 2015, we booked total orders of $8.4 million for 45 units, or 7.6 megawatts, compared to $23.8 million for 198 units, or 25.1 megawatts, during the three months ended September 30, 2014. We shipped 58 units with an aggregate of 11.6 megawatts, generating microturbine product revenue of $11.6 million compared to 166 units with an aggregate of 28.5 megawatts, generating microturbine product revenue of $26.7 million during the three months ended September 30, 2014. Total backlog as of September 30, 2015 decreased $67.5 million, or 39%, to $104.8 million from $172.3 million as of September 30, 2014. As of September 30, 2015, we had 579 units, or 108.0 megawatts, in total backlog compared to 884 units, or 186.8 megawatts, at the same date last year. Ending backlog as of September 30, 2015, includes the

removal of approximately $52.4 million for 200 units, or 64.5 megawatts, from BPC Engineering ("BPC"), one of the Company's Russian distributors. This removal is a proactive measure to align our backlog to management's expectations because of the current macroeconomic headwinds, such as the continued softness of the global oil and gas market, a substantially stronger U.S. dollar (making our products more expensive overseas) and on-going geopolitical tensions in Russia, as experienced during Fiscal 2015. A significant portion of our backlog is concentrated in the international oil and gas market which may impact the overall timing of shipments or the conversion of backlog to revenue.

151. Moreover, during a conference call with investors and analysts on November 5, 2015, Defendant Brooks, in relevant part, stated:

> Now I'll provide some comments on our backlog accounts receivable and cash flow. Our product backlog as of September 30, 2015 was $104.8 million compared with $172.3 million as a September 30, 2014. The year-over-year decrease was $67.5 million or 39%. The decrease in backlog includes our decision to remove $52.4 million or 200 units totaling 64.5 megawatts in backlog from BPC to align our backlog with management expectation because of the current macroeconomic climate in Russia and the oil and gas market.

152. Additionally, during this same conference call, Defendant Jamison, in response to a question from an analyst, in relevant part, stated:

> [Analyst]: …And just one final question. In Russia with BPC you noted that you received – I think 150,000 this quarter in payments. How much of the receivables are still outstanding? Do you expect any visibility into future payments next quarter or thereafter?
>
> [Defendant Jamison]: Yes, like as we said, we're on the ground this week meeting with them. The good news is they're still viable; they've diversified their business into some gas compression and some other areas so that's good. Over half of their revenue right now is coming outside of Russia, primarily Belarus and some of the other stance. So I think they've done the right things to overcome the

> headwinds they have in the market, they are forecasting about seven to eight megawatts next year. We're hopeful to get a payment from them before the end of the calendar year to help to pay down that receivable but that receivable still approximately $7 million today.

153. On this news, shares of Capstone declined $0.32 per share, or 7.2% to close at $5.06 per share on November 6, 2015 on unusually heavy volume. The stock price continued to decline, falling by $0.95, or more than 23%, to close at $3.04 on November 9, 2015, another $0.25, or approximately 8%, to close at $2.79 on November 10, 2015, and another $0.62, or approximately 22%, to close at $2.17 per share on November 11, 2015 on heavy volume.

154. During the Class Period, Plaintiffs and the Class purchased Capstone securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## X. ADDITIONAL SCIENTER ALLEGATIONS

112. The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the Company's improper revenue recognition; and/or (b) their failure to properly review the transactions prior to revenue recognition; and/or (c) their intentional issuance of materially false or misleading financial statements which prematurely and improperly recognized revenue on certain transactions; and/or (d) their intentional issuance of materially false or

misleading statements, regarding the Company's backlog; and/or (e) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

155. The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.

**A. BPC Was One of Capstone's Largest Customers**

156. Both prior to and during the Class Period, BPC was one of Capstone's largest customers. In fact, BPC was responsible for 11%, 17% and 11% of Capstone's revenue for the Company's fiscal 2014, 2013 and 2012 years, respectively. Moreover, in the Company's 2014 fiscal fourth quarter, in which Defendants improperly recognized revenue for BPC's purported sales, BPC's purported sales accounted for 25% of the Company's total revenue for the quarter. Additionally, in the Company's 2015 fiscal first quarter, in which Defendants improperly recognized revenue for BPC's purported sales, BPC's purported sales

accounted for 13% of the Company's total revenue for the quarter. The Individual Defendants were aware of the particulars of transactions that constituted more than 10% of the entire Company's revenues, or if the Company's CEO and CFO were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members.

157. Moreover, at the start of the Class Period, BPC had the largest accounts receivable balance of any Capstone customer or distributor, accounting for more than a quarter (26%) of the Company's total accounts receivable. Moreover, until the Company took a multi-million dollar reserve for BPC's accounts receivables, BPC alone accounted for 36%, 36% and 38% of the Company's accounts receivables for the first three quarters of Capstone's fiscal 2015.

113. Since BPC comprised such a large percentage of the Company's accounts receivable, the most reasonable inference is that the Individual Defendants were aware of BPC's ballooning DSO and lack of payment for purported sales, and that collectibility of payment was not assured when the Company immediately recognized revenue on the transactions at issue, or if the Company's CEO and CFO were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members.

### B. Throughout the Class Period the Individual Defendants Communicated Directly with Representatives of BPC

158. According to the Individual Defendants, they maintained consistent communication with representatives of BPC. For example, prior to the Class Period, Defendant Jamison, during a conference call with analysts and investors, explained that that BPC's representatives were actually at Capstone's offices to meet with the Company's executives and officers:

> Q1 was not a great quarter for our Russian distributor. We do see Q2 as him returning to some more historic levels. He's actually in the building today with one of his key customers.

159. Similarly, on June 12, 2014, Defendant Jamison explained that his views on the climate in Russia were based on communications with BPC representatives:

> As I said on the – my prepared comments, our business in Russia hasn't changed. Our megawatt shipments per quarter had been fairly flat the last two or three quarters, which has been good. The numbers have been up. Payments have been typically Russian, which can be a little bit hit or miss. But obviously, we've seen really no change.
>
> ***And talking to Russian distributor***, he feels this is much more an American issue than a Russian issue.

(Emphasis added.)

160. On February 5, 2015, Defendant Jamison again touted that representatives of BPC were in Capstone's offices:

> So the business in Russia has slowed down that did impact us in the quarter. And in general the strength of the dollar hurt us a little bit.

> But I'd say definitely the biggest miss was the drop in business with BPC.
>
> ***That being said, they were in our offices yesterday and today.*** They are diversifying their business. They're moving more into Belarus and Kazakhstan. They're moving more into CHP and CCHP as you've seen in some of the recent releases. They still have a good associated gas business, but definitely the only gas business in Russia and the impact of the ruble to Russia proper is challenging.

(Emphasis added.)

161. Additionally, during this same call, Defendant Reich explained that he had recently met with BPC's CFO:

> I can just add that I met with their [BPC] CFO yesterday who's – and their corporate level CFO who's in-charge of all their businesses and I'm very comfortable with that receivable and it's collectability going forward and don't expect any change in behavior of the way they pay their bills.

162. This close relationship is unsurprising since, as Defendant Jamison explained, BPC is "one of our biggest and most important partners" and Capstone has "a 10-year relationship with [BPC]."

163. Due to the constant communications with BPC's representatives, the most probable inference is that the Individual Defendants had knowledge of, or were reckless in not knowing, the nature and terms of its transactions with BPC and that BPC's backlog was overstated due to BPC's desire to maintain the ability to purchase products at lower prices.

### C. The Individual Defendants Personally Approved Discounts and Changes in Contract Terms

164. As discussed above, Capstone's standard terms of sales to distributors (and direct end users) include payment terms ranging from full payment in advance of shipment to payment in 90 days. According to CW1, Capstone's standard payment terms were payment within 30 days, yet customers could change their contract terms for individual orders. When this occurred, CW1 would have to get approval from either Defendant Jamison or Defendant Brooks.

165. CW1 also stated that Capstone's distributors often received a "standard discount" of 25% on every order. According to CW1, Capstone often provided an additional discount of between 5% to 15% on top of the standard discount. CW1 stated that BPC often received an additional discount of 10% on its orders.

166. If a discount on an order totaled more than $100,000, or 7%, CW1 was required to get the approval of Defendant Jamison before booking the sale. If a discount was less than these amounts, then the Company's Executive Vice President of Sales & Marketing, Jim Crouse could provide approval.

167. As the transactions at issue were for millions of dollars and BPC often received discounts of more than 10% over the standard discount of 25%, the discounts for these transactions would have been well over $100,000, necessitating the approval of Defendant Jamison. This supports an inference that Defendant

Jamison had knowledge of, or was reckless in not knowing, the nature and terms of its transactions with BPC.

### D. The Individual Defendants Claimed to Have Conducted a Review of Capstone's Backlog

168. According to Defendant Jamison, during the Company's 2015 fiscal fourth quarter, the Company conducted a review of its backlog and determined that its backlog was accurate and that it was unnecessary to remove any of BPC's backlog. As Defendant Jamison stated in response to an analyst's question during the Company's June 15, 2015 earnings call:

> [Analyst]: Hey. Maybe you can start with backlog, just wondering if you've some comments on the health of backlog. I'm sure you've scrubbed it. But is this something we're going forward given your headwinds I mean thinking about cancellations potentially or I mean, is this still more about just timing push out?
>
> [Defendant Jamison]: Yeah. No, great question. ***We have scrubbed it very hard.*** We've seen very little cancellations in the last two quarters, especially in Q4. We do believe that there is – we'll continue to see some push outs, but I think we're encouraged with the stabilization of crude oil prices and in the ruble that we're going to see some acceleration of that backlog going forward.
>
> ***So I think as we look at it, we kind of believe that we are through the worst of it and that we'll come out the other side of the trough especially in Q1 and Q2 and look for a strong second half of the year. So we don't see any reason to modify the backlog and again have not seen any recent cancellations.***
>
> [Analyst]: And is BPC, I mean, can you speak to [ph] and maybe it's probably in the queue (37:02), but can you speak to what percentage they are of the backlog or how much they are?

> [Defendant Jamison]: We don't break them out, but let's talk about BPC in general. We took a very large AR hit this quarter that is a reserve not a write-off which is there's obviously a very big difference. We thought it was the prudent thing to do in working with our auditors and the way to properly reflect the risk in the business and the lack of visibility that we have.
>
> That being said, they've made some payments already in the first quarter. We expect more payments by the end of June. We expect to reverse some of the product that we shipped and take revenue on it last quarter as well as probably get some recovery on the bad debt reserve. That should happen each quarter going forward. They are in cash up front, but again, this is a fairly large distributor. We got a 10-year relationship with them. They're not going out of business. This is not a green environment situation.

(Emphasis added.)

169. Such a review should have uncovered that the Company's backlog contained almost decade-old "sales" to BPC and that the backlog was overstated due to BPC's desire to maintain the ability to purchase products at lower prices. The only reasonable inference that can be made from the fact that this investigation failed to uncover that the Company's backlog was overstated – even though the Company itself announced the removal of ***52.4 million of backlog for BPC Engineering less than six months later*** – is that the Individual Defendants had knowledge of, or were reckless in not knowing, that the backlog was overstated due to its improper inclusion of certain BPC "sales."

## XI. CLASS ACTION ALLEGATIONS

170. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Capstone securities between June 12, 2014 and November 5, 2015, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

171. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Capstone securities were actively traded and quoted on the NASDAQ Stock Market ("NASDAQ"), a highly efficient marketplace. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Hundreds of thousands of Capstone shares were traded publicly during the Class Period, demonstrating an active and broad market for Capstone stock and permitting a strong presumption of an efficient market. Record owners and other members of the Class may be identified from records maintained by Capstone, or

its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

172. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

173. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

174. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, management, and prospects of Capstone; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

175. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. UNDISCLOSED ADVERSE FACTS

176. The market for Capstone securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, Capstone securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Capstone securities relying upon the integrity of the market price of the Company's securities and market information relating to Capstone, and have been damaged thereby.

177. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Capstone securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and/or omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth

about the Company, its business, operations, management, and prospects, as alleged herein.

178. At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Capstone's operations and financial performance. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its operations and financial performance, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

179. The market for Capstone securities was open, well developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Capstone securities traded at artificially inflated prices during the Class Period.

180. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Capstone securities and market information relating to Capstone, and have been damaged thereby. On June 17 & 19, 2014, the Company's stock closed at Class Period highs of $31.40 per share. During the Class Period, the artificial inflation of Capstone's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Capstone's operations and financial results. These material misstatements and/or omissions created an unrealistically positive assessment of Capstone and its business, operations, management, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

181. At all relevant times, the market for Capstone securities was an efficient market for the following reasons, among others:

a. Capstone stock met the requirements for quotation and/or listing, and was quoted and/or listed and actively traded and/or quoted on the NASDAQ, a highly efficient marketplace;

b. As a regulated issuer, Capstone filed periodic public reports with the SEC;

c. Capstone regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Capstone was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace

182. As a result of the foregoing, the market for Capstone securities promptly digested current information regarding Capstone from all publicly available sources and reflected such information in Capstone's stock price. Under these circumstances, all purchasers of Capstone securities during the Class Period

suffered similar injury through their purchase of Capstone securities at artificially inflated prices and a presumption of reliance applies.

## XIV. NO SAFE HARBOR

183. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Capstone who knew that the statement was false when made.

## XV. COUNTS

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

184. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Capstone securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

186. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Capstone securities in violation of Section 10(b) of the Exchange Act and Rule 10b 5. All Defendants are sued either as primary participants in the

wrongful and illegal conduct charged herein or as controlling persons as alleged below.

187. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Capstone's business, operations, management, and prospects, as specified herein.

188. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Capstone's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Capstone and its operations and financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

189. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were

high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

190. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Capstone business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the

Company's operations and financial results throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

191. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Capstone securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Capstone securities during the Class Period at artificially high prices and were damaged thereby.

192. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Capstone was experiencing, which

were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Capstone securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

193. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

194. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

195. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

196. The Individual Defendants acted as controlling persons of Capstone within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power

to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

197. In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

198. As set forth above, Capstone and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 6, 2016

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Casey E. Sadler*
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Plaintiffs and the Class*

## SWORN CERTIFICATION OF PLAINTIFF

## CAPSTONE TURBINE CORP. SECURITIES LITIGATION

I, John Perez, individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase Capstone Turbine Corp., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Capstone Turbine Corp. during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

5/5/2016

Date

DocuSigned by:

John Perez

1C131D8FC0CD415...

John Perez

**John Perez's Transactions in**
**Capstone Turbine Corp (CPST)**

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 12/26/2014 | Bought | 9,000 | $0.7442 |
| 01/27/2015 | Bought | 10,000 | $0.6511 |
| 05/08/2015 | Bought | 12,500 | $0.5490 |
| 05/29/2015 | Bought | 10,000 | $0.4461 |
| 06/30/2015 | Bought | 10,000 | $0.3758 |
| 10/01/2015 | Sold | -7,200 | $0.2830 |
| 10/22/2015 | Sold | -52,800 | $0.2300 |

**Account 2**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 01/16/2015 | Bought | 1,500 | $0.6853 |

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On May 6, 2016, I caused to be served the following document:

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties as listed on the Court's ECF Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 6, 2016, at Los Angeles, California.

*s/ Casey E. Sadler*

Casey E. Sadler

# Mailing Information for a Case 2:15-cv-08914-DMG-RAO In re Capstone Turbine Corp. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam M Apton**
  aapton@zlk.com
- **Peter A Binkow**
  pbinkow@glancylaw.com
- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com
- **Brittany DeJong**
  dejong@whafh.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **Michael M Goldberg**
  michael@goldberglawpc.com,dmacdiarmid@glancylaw.com,info@glancylaw.com,brian@goldberglawpc.com
- **J Alexander Hood**
  ahood@pomlaw.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com
- **Drew S Liming**
  dliming@wsgr.com,rlustan@wsgr.com
- **Marisa C Livesay**
  livesay@whafh.com,boyles@whafh.com
- **Nina Fran Locker**
  nlocker@wsgr.com,rdean@wsgr.com
- **Betsy C Manifold**
  manifold@whafh.com,cabrera@whafh.com,boyles@whafh.com,loritsch@whafh.com
- **Joni L Ostler**
  jostler@wsgr.com,eblackey@wsgr.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Lesley F Portnoy**
  LPortnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Rachele R Rickert**
  rickert@whafh.com,cabrera@whafh.com,boyles@whafh.com,loritsch@whafh.com,cothran@whafh.com
- **Kevin F Ruf**

kruf@glancylaw.com,info@glancylaw.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com,info@glancylaw.com

- **Howard G Smith**
  howardsmith@howardsmithlaw.com

- **Stephen Bruce Strain**
  sstrain@wsgr.com,pbaird@wsgr.com

- **Avi N Wagner**
  avi@thewagnerfirm.com,anwagneresq@hotmail.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Brian                Schall
Goldberg Law PC
13650 Marina Pointe Drive Suite 1404
Marina Del Rey, CA 90292
```