GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Casey E. Sadler (#274241)
Stan Karas (#222402)
Christopher R. Fallon (#235684)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

*Lead Counsel for Plaintiffs and the Settlement Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re CAPSTONE TURBINE CORPORATION SECURITIES LITIGATION | Lead Case No.: 2:15-CV-08914-DMG-RAOx |
| | **DECLARATION OF CASEY E. SADLER IN SUPPORT OF:  (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** |
| | Date:     November 15, 2019 |
| | Time:     10:00 a.m. |
| | Crtm:     8C |
| | Judge:    Hon. Dolly M. Gee |

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................1

II.   PROSECUTION OF THE ACTION.................................................................4

      A.    Background ..............................................................................................4

      B.    Commencement Of The Instant Action ................................................6

      C.    The Comprehensive Pre-Filing Investigation And Preparation Of The Consolidated Complaint..........................................................................7

      D.    Defendants' Motion To Dismiss The Consolidated Complaint And Plaintiffs' Response Thereto..................................................................8

      E.    Plaintiffs' Filing Of The Amended Complaint And The Court's Denial Of Defendants' Motion To Dismiss......................................................10

      F.    Discovery Commences And The Parties Agree To Mediate...............12

      G.    The Mediation Process, Which Included Discovery And Substantial Briefing, Ultimately Results In A Settlement ......................................13

      H.    Preliminary Approval Of The Settlement ...........................................14

III.  THE SETTLEMENT IS REASONABLE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION ....................................................................15

IV.   THE RISKS OF CONTINUED LITIGATION .............................................17

      A.    Risks To Proving Liability...................................................................17

      B.    Risks To Proving Loss Causation And Damages ...............................18

      C.    Other Risks............................................................................................19

V.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE...................21

VI.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT.................23

VII.    THE FEE AND LITIGATION EXPENSE APPLICATION .........................24

     A.     The Fee Application...............................................................25

          1.     The Work And Experience Of Lead Counsel............................26

          2.     Standing And Caliber Of Defendants' Counsel .........................28

          3.     The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk Contingent Securities Cases .........................................................................29

          4.     The Reaction Of The Settlement Class To The Fee Application..............................................................................30

          5.     Plaintiffs Support The Fee Application ......................................31

     B.     The Litigation Expense Application .......................................31

VIII.   CONCLUSION ...................................................................................35

## TABLE OF EXHIBITS TO DECLARATION

| EX. | TITLE |
| --- | --- |
| 1 | Declaration of Brian Manigault Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; (C) Report on Requests for Exclusion and Objections; and (D) the Claims Administration Process ("Mailing Declaration") |
| 2 | Excerpts from Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review (NERA Jan. 29, 2019) |
| 3 | Table of Peer Law Firm Billing Rates |
| 4 | Glancy Prongay & Murray LLP Resume |
| 5 | Declaration of Lead Plaintiff Randall Kay in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses ("Randall Kay Declaration") |
| 6 | Declaration of Lead Plaintiff Elizabeth Kay in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses ("Elizabeth Kay Declaration") |
| 7 | Declaration of Named Plaintiff David Kinney in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses ("Kinney Declaration") |
| 8 | Declaration of Named Plaintiff John Perez in Support of: (I) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses ("Perez Declaration") |
| 9 | Final Order and Judgment, *In re Interlink Elec., Inc. Sec. Litig.*, No. 05-cv-08133 AG (SH) (C.D. Cal. June 1, 2009), Dkt. No. 165 |
| 10 | Final Order and Judgment of Dismissal; Order Awarding Attorneys' Fees and Reimbursement of Expenses, *Jenson v.* |

| | | |
|---|---|---|
| | | *First Trust Corp.*, No. CV 05-3124 ABC (CTx), Final Order and Judgment (C.D. Cal. June 9, 2008), Dkt. No. 134 |
| | 11 | Amended Order Awarding Lead Counsel Attorneys' Fees and Expenses, *Hodges v. Akeena Solar, Inc.*, No. 5:09-cv-02147-JW (N.D. Cal. Dec. 15, 2011), Dkt. No. 167 |
| | 12 | Final Judgment and Order of Dismissal with Prejudice, *In re Resonant Inc. Sec. Litig.*, No. 2:15-cv-01970 SJO (MRW) (C.D. Cal. Nov. 22, 2017), Dkt. No. 154 |
| | 13 | Final Order for Reimbursement of Attorneys' Fees and Expenses, *In re 2TheMart.com, Inc. Sec. Litig.*, No. 99-cv-1127-DOC (ANx) (C.D. Cal. July 8, 2002), Dkt. No. 161 |
| | 14 | Order and Final Judgment of Dismissal with Prejudice, *Elliot v. China Green Agriculture Inc.*, No. 3:10-cv-00648-LRH-WGC (D. Nev. Aug. 12, 2014), Dkt. No. 166 |
| | 15 | Order Awarding Attorneys' Fees and Litigation Expenses, *In re HP Sec. Litig.*, No. 3:12-cv-05980-CRB (N.D. Cal. Nov. 16, 2015), Dkt. No. 279 |

1    I, Casey E. Sadler, declare as follows:

2    **I.    INTRODUCTION**

3        1.    I am an attorney admitted to practice before this Court.  I am a partner

4    at the law firm Glancy Prongay & Murray LLP ("GPM"), the Court-appointed Lead

5    Counsel in this Action.[1]  GPM represents the Court-appointed Lead Plaintiffs

6    Randall and Elizabeth Kay (collectively "Lead Plaintiffs"), and named plaintiffs

7    David Kinney and John Perez (collectively "Named Plaintiffs" and together with

8    Lead Plaintiffs, "Plaintiffs"), and the proposed Settlement Class.  I have personal

9    knowledge of the matters set forth herein based on my participation in the

10   prosecution and settlement of the claims asserted in the Action.

11       2.    I respectfully submit this Declaration in support of Plaintiffs' motion,

12   pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of

13   the proposed $5,550,000 settlement (the "Settlement") that the Court preliminarily

14   approved by Order dated May 17, 2019 (the "Preliminary Approval Order"); as well

15   as of the proposed plan for allocating the proceeds of the Net Settlement Fund to

16   eligible Settlement Class Members (the "Plan of Allocation") (collectively, the

17   "Final Approval Motion").    Dkt. No. 122.[2]    I also respectfully submit this

18

19   _____

20   [1] All terms capitalized terms not otherwise defined herein shall have the meanings
     ascribed to them in Stipulation and Agreement of Settlement dated April 12, 2019

21   (the "Stipulation").  Dkt. No. 118-1.

22   [2] Pursuant to the Preliminary Approval Order, Lead Counsel were directed to file

23   their motion for an award of attorneys' fees and Litigation Expenses by September
     24, 2019, and the Final Approval Motion by October 25, 2019.  ¶ 28.  Thus, in

24   conjunction with this Declaration, Lead Counsel are submitting the motion for an
     award of attorneys' fees and Litigation Expenses (the "Fee and Expense

25   Application") and the accompanying memorandum (the "Fee Memorandum").  The

26   Final Approval Motion and accompanying memorandum will be submitted by
     October 25, 2019.  However, to avoid burdening the Court with voluminous and

27

28

1    Declaration in support of Lead Counsel's motion for an award of attorneys' fees in
2    the amount of 26.2% of the Settlement Fund, which equates to $1,454,500, plus
3    interest earned at the same rate as the Settlement Fund; reimbursement of Lead
4    Counsel's expenses in the amount of $78,084.47; and awards in accordance with the
5    Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses
6    incurred by Lead Plaintiffs Randall and Elizabeth Kay ($22,500 and $3,500,
7    respectively), and Named Plaintiffs David Kinney and John Perez ($2,500 each),
8    related to their representation of the Settlement Class.

9          3.    The proposed Settlement now before the Court provides for the
10   resolution of all claims in the Action in exchange for a cash payment of $5,550,000.
11   As detailed below, Plaintiffs and Lead Counsel respectfully submit that the
12   Settlement represents an extremely favorable result for the Settlement Class when
13   juxtaposing the significant risks of continued litigation against the recovery.  In fact,
14   the maximum potential damages potentially recoverable for the Settlement Class, *if*
15   Plaintiffs fully prevailed in each of their claims at both summary judgment and after
16   a jury trial, and *if* the Court and jury fully accepted Plaintiffs' loss causation and
17   damages arguments—*i.e.*, Plaintiffs' ***best case scenario***—is approximately $29.8
18   million.    Under this best-case scenario, the $5,550,000 Settlement Amount
19   represents approximately 18.6% of the total maximum damages potentially
20   recoverable in this Action.   Of course, Defendants had advanced, and would
21   continue to advance, serious arguments with respect to liability, loss causation and
22   damages.    If any of these arguments were accepted, Plaintiffs' potential recovery
23   would have been substantially reduced or completely eliminated.  Therefore, and as
24   explained further below, the Settlement provides a considerable benefit to the

25   _____
26   duplicative filings, this declaration is in support of both the Fee and Expense
27   Application and the Final Approval Motion.

28

Settlement Class by conferring a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation.

4.     The proposed Settlement is the result of Lead Counsel's extensive efforts, which included, among other things: (a) a comprehensive investigation conducted by Lead Counsel prior to filing the 91-page Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Consolidated Complaint") and the 104-page Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("Amended Complaint"), which included retaining accounting and damages experts and private investigators that interviewed numerous confidential witnesses; (b) fully briefing Defendants' motions to dismiss the Consolidated Complaint and the Amended Complaint, and successfully obtaining denial of Defendants' motion to dismiss the Amended Complaint in its entirety; (c) engaging in discovery, including negotiating a protective order, serving and responding to formal discovery prior to entry of a temporary stay to allow for mediation, and exchanging informal discovery to allow for informed negotiations during the mediation; (d) participating in a robust mediation process, which included drafting two substantial mediation statements and attending a full-day mediation under the auspices of an experienced third-party mediator, former federal District Judge Layn R. Phillips; (e) drafting the Stipulation and supporting documents and engaging in negotiations with defense counsel with respect to these documents; and (f) successfully moving the Court for preliminary approval of the Settlement and overseeing the notice process for the Settlement.

5.     Based on the aforementioned efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents an extremely favorable outcome for the Settlement Class.

6.     As discussed in further detail below, the Plan of Allocation was developed with the assistance of Plaintiffs' damages expert and provides for the

distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on their losses attributable to the alleged fraud.

7.     With respect to the Fee and Expense Application, as discussed in the Fee Memorandum, the requested fee of 26.2% of the Settlement Fund (or $1,454,500, plus interest earned at the same rate as the Settlement Fund), was negotiated between Lead Counsel and Lead Plaintiff Randall Kay, approved by each of the Plaintiffs, and is well within the range of percentage awards granted by courts in the Ninth Circuit in comparable securities class actions.   Additionally, the requested fee results in a multiplier of 1.04 on Lead Counsel's lodestar, which is within, and even below, the range of multipliers routinely awarded by courts in the Ninth Circuit.

8.     For all of the reasons discussed in this Declaration and in the accompanying memoranda, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Counsel respectfully submit that their request for attorneys' fees and reimbursement of Litigation Expenses is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background

9.     Capstone Turbine Corporation ("Capstone" or the "Company") develops, manufactures, markets and services microturbine technology solutions for use in stationary distributed power generation applications.   According to the Company, the turbines are environmentally friendly compared to competing technologies.   The Company's securities trade on the NASDAQ Stock Market under the ticker symbol "CPST."

10.	The basis of Plaintiffs' claims in this Action are that, to divert attention away from its poor revenues, Capstone continually touted its backlog figures (*i.e.*, items that were ordered but not shipped), which Defendants claim demonstrated Capstone's future revenue growth.  According to Plaintiffs, Defendants, however, failed to disclose that Capstone's backlog figures were drastically overstated and that there was no reasonable expectation of payment for a substantial portion of the backlog.  Specifically, throughout the Settlement Class Period (June 12, 2014 through November 5, 2015), Defendants never disclosed that BPC Engineering ("BPC"), one of the Company's Russian distributors and its largest and most important client, was manipulating the backlog with Defendants' eager cooperation and that Defendants recognized revenue for certain of BPC's purchases when collectibility was not reasonably assured.

11.	Specifically, Plaintiffs alleged that to ensure access to lower prices in the event that it later decided to purchase products, BPC placed millions of dollars in placeholder orders, allowing BPC to purchase Capstone's product at no-longer-available prices from years earlier.  By the start of the Settlement Class Period, Capstone touted a backlog of $171.6 million, without disclosing that at least $52.4 million, or approximately 30%, of the backlog consisted of old BPC placeholder orders.  In fact, certain of BPC's backlogged orders were from as far back as 2011.  Even though Capstone's management was aware of this practice, and realized that few if any of these stale orders would be shipped and paid for, it improperly included these orders in Capstone's backlog figures.  Indeed, Defendants continued to tout the strength of the backlog even though BPC's payments were chronically late during the Settlement Class Period and, when made, were only for a small fraction of the amount outstanding.

12.	At the end of the Settlement Class Period, Defendants finally acknowledged the truth and removed from the backlog $52.4 million worth of BPC's orders.  The amount removed was more than 30% of Capstone's entire

backlog reported in the previous quarter.   The Company's stock plummeted following this disclosure.

13.   Not only did the Company overstate its backlog, but Defendants also improperly recognized revenue from BPC during the Settlement Class Period. Russia, one of Capstone's biggest markets, faced crippling sanctions following its annexation of Crimea.  These sanctions resulted in a material slowdown in BPC's business. Defendants eventually acknowledged that sanctions impacted BPC's ability to pay and that BPC already did not pay for its purchases in a timely or uniform manner.  Nevertheless, Capstone immediately recognized revenue on $9.1 million in sales to BPC.  The next quarter, after the Company learned that BPC had not paid for these prior sales in the 90-day period mandated in its sales contracts and that BPC's days sales outstanding (a representation of the days between sales and payment) increased from 72 days to a staggering 259 days, Capstone nevertheless immediately recognized revenue on another $3 million in sales to BPC. Unsurprisingly, Capstone was subsequently forced to take a bad debt reserve of over $7 million against BPC's receivables.

**B.   Commencement Of The Instant Action**

14.   Beginning on November 16, 2015, two class action complaints were filed in the United States District Court for the Central District of California, styled *Kinney v. Capstone Turbine Corp., et al.*, Case No. 2:15-cv-08914-DMG-RAO, and *Grooms v. Capstone Turbine Corp., et al.*, Case No. 2:15-cv-09155-DMG-RAO.

15.   On January 15, 2016, four movants filed motions to be appointed lead plaintiff under the PSLRA and for appointment of their selected counsel to serve as lead counsel in this Action.   Following the filing of opposition and reply memoranda, the Court heard oral argument on the motions on February 26, 2016, which Lead Plaintiff Randall Kay attended in person.

16.   By order dated February 29, 2016, the Court: (a) consolidated and re-captioned the cases as *In re Capstone Turbine Corp. Sec. Litig.*, Lead Case No.:

2:15-CV-08914-DMG-RAOx; (b) appointed Randall and Elizabeth Kay to serve as Lead Plaintiffs for the consolidated action; and (c) approved Lead Plaintiffs' selection of Glancy Prongay & Murray LLP as Lead Counsel for the proposed plaintiff class.  Dkt. No. 57.

### C.    The Comprehensive Pre-Filing Investigation And Preparation Of The Consolidated Complaint

17.    Lead Counsel conducted an extensive detailed investigation of Capstone and the alleged fraud in connection with researching and drafting the Consolidated and Amended Complaints.  This investigation included, among other things: (a) reviewing and analyzing (i) the Company's public SEC filings, including the Company's annual and quarterly filings, (ii) press releases published by and regarding Capstone, (iii) transcripts of Capstone's investor calls, (iv) publicly available documents, announcements, and news articles concerning Capstone, the Russian market, sanctions related to the war in the Ukraine, the international marketplace for Capstone's equipment, (v) available information regarding Capstone's top distributors, which included uncovering and analyzing the distributors' UCC filings to track the purchase, sale and transfer of Capstone equipment, and (vi) research reports prepared by securities and financial analysts regarding Capstone; (b) working with a damages and loss causation expert to analyze Capstone's stock price movements; (c) retaining and working with private investigators who conducted numerous interviews with former employees with relevant information; (d) researching applicable Generally Accepted Accounting Principles ("GAAP") pertaining to accounting adjustments and earnings management; and (e) consulting and working with an accounting expert to analyze Capstone's class period financial results and the Company's reported backlog.

18.    On May 6, 2016, Plaintiffs filed and served the 91-page Consolidated Complaint asserting claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated

1  thereunder, and against the Individual Defendants under Section 20(a) of the
2  Exchange Act.  Dkt. No. 66.

3      **D.    Defendants' Motion To Dismiss The Consolidated Complaint And
              Plaintiffs' Response Thereto**
4

5      19.    On June 17, 2016, Defendants filed and served their motion to dismiss
6  the Consolidated Complaint.  Dkt. No. 67.  Defendants argued that the Consolidated
7  Complaint failed to adequately plead that Defendants' financial statements or
8  statements regarding backlog were false or misleading and that scienter was not
9  adequately alleged.

10     20.    More specifically, Defendants argued that the Consolidated Complaint
11 failed to adequately allege that Capstone should have taken a reserve for BPC's
12 receivables prior to the Company's 2015 fiscal fourth quarter since the Consolidated
13 Complaint failed to allege that the Company did not subjectively believe that its
14 receivables were not reasonably collectible.  Defendants further argued that there
15 was no falsity since the facts that Plaintiffs relied on were publicly disclosed.

16     21.    Defendants further argued that the Company's backlog statements were
17 not false since the Consolidated Complaint's allegations, which were in part based
18 on recollections of a confidential witness, did not allege that there was anything
19 improper about Capstone's practice of maintaining old orders on its backlog.
20 Defendants further argued that the Company's backlog statements were non-
21 actionable since they were forward-looking and protected by the PSLRA safe
22 harbor.  Finally, Defendants argued that there was no evidence of scienter, since: (a)
23 no false statements were made, (b) there was no motive to commit securities fraud
24 as there were no insider sales of Capstone stock during the class period, and (c) the
25 Company's auditors had signed off on the Company's accounting treatments at
26 issue.

27     22.    On July 29, 2016, Plaintiffs filed and served their papers in opposition
28 to the motion to dismiss.  Dkt. No. 72.  Plaintiffs argued that the Company's

statements regarding its recognition of revenue were false and misleading since at the time the revenue was recognized, collectibility was not reasonably assured and/or the sales price was not fixed and determinable.   Likewise, since the Company's revenue was overstated, Plaintiffs alleged that the Company's financial statements were also misleading due to the subsequent overstatement of Capstone's accounts receivables and understatement of its reserves.

23.    In addition, Plaintiffs argued that the backlog statements were false and misleading as they omitted present facts regarding the backlog such that the backlog was not a reasonable indicator of future revenue, as Defendants touted. Additionally, Plaintiffs argued that, since the statements were misleading due to an omission of information, the PSLRA safe harbor did not apply and that even if it did apply, the misstatements were not accompanied by meaningful cautionary language.

24.    Plaintiffs also argued that Defendants were deliberately reckless in omitting material negative information that they knew rendered favorable statements misleading, and thus Plaintiffs had sufficiently alleged scienter.   Additionally, Plaintiffs argued that Defendants must have known the information at issue since it involved Capstone's core operations and Defendants had actual access to the information at issue.  Plaintiffs also responded to the many arguments advanced by Defendants.

25.    On September 23, 2016, Defendants filed and served their reply papers. Dkt. No. 75.   Thereafter, on November 7, 2016, Defendants filed a notice of supplemental authority (Dkt. No. 78), which Plaintiffs responded to on November 18, 2016 (Dkt. No. 79).

26.    The Court found Defendants' motion appropriate for resolution on the papers and, on March 10, 2017, the Court entered an Order granting Defendants' motion to dismiss the Consolidated Complaint.  *See* Dkt. No. 80.  The Court held that the Consolidated Complaint failed to adequately allege falsity and scienter as to

the challenged statements, but gave Plaintiffs leave to amend to attempt to cure the deficiencies.

**E.**   **Plaintiffs' Filing Of The Amended Complaint And The Court's Denial Of Defendants' Motion To Dismiss**

27.   On April 28, 2017, Plaintiffs filed and served the 104-page Amended Complaint.   Dkt. No. 83.   The Amended Complaint, like the Consolidated Complaint, asserted claims against Defendants Capstone, Jamison, and Brooks under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against Individual Defendants Jamison and Brooks under Section 20(a) of the Exchange Act.   The Amended Complaint alleged claims substantially similar to those alleged in the Consolidated Complaint but also included additional alleged facts from both new and already referenced confidential witnesses, relating to the confidential witnesses' positions and bases of knowledge and that BPC had been placed on a credit hold prior to the Settlement Class Period.   The Amended Complaint also alleged additional facts related to Capstone's purported deviation from its standard payment policies by granting BPC extended payment terms, that orders were rarely, if ever, removed from the backlog and that Capstone's access to working capital was dependent on its amount of accounts receivable.

28.   On June 2, 2017, Defendants filed and served a motion to dismiss the Amended Complaint.   Dkt. No. 85.   In their motion to dismiss, Defendants argued again, among other things, that Plaintiffs failed to allege materially false or misleading statements or particularized facts sufficient to demonstrate Defendants' scienter.   Specifically, Defendants argued that Plaintiffs still failed to allege with particularity that the collectibility of BPC's accounts receivable was not reasonably assured.   Additionally, Defendants argued that Plaintiffs failed to sufficiently allege that the backlog was overstated since it did not include any canceled orders and that the Court had already ruled that the relevant confidential witness's allegations were insufficient.   Defendants also argued that Plaintiffs still could not allege facts

demonstrating that Defendants had made the purportedly false statements with scienter.

29.     On July 7, 2017, Plaintiffs filed and served their opposition to the motion to dismiss.  Dkt. No. 87.  Plaintiffs argued that the Amended Complaint had cured the deficiencies identified in the Court's previous motion to dismiss order, which included that Plaintiffs had failed to allege sufficient facts demonstrating that collectibility of revenue from its largest and most important customer, BPC, was not reasonably assured and that Capstone's backlog was overstated due to the inclusion of illusory "placeholder" orders that BPC maintained so that it could potentially order products at lower prices in the future.  Specifically, Plaintiffs argued that they cured these deficiencies by adding additional detailed allegations demonstrating that Defendants improperly booked revenue when collectibility was not reasonably assured and that the Company's backlog was materially overstated.   These additional, detailed allegations included: (a) allegations of a new confidential witness, a former Capstone director of customer service, who explained that BPC was on a credit hold – *i.e.*, required to pay for Capstone's products prior to shipment – throughout the Settlement Class Period, in part due to BPC's disproportionate outstanding accounts receivable, and that BPC had credit issues prior to the Crimea invasion; and (b) additional new testimony from a confidential witness regarding Capstone's backlog and the basis of this confidential witness's personal knowledge.  Moreover, the Amended Complaint included new allegations demonstrating the Individual Defendants' scienter, including that Capstone, which was in dire financial straits due to its continued financial unprofitability, needed to recognize revenue and maintain artificially high accounts receivable to retain access to necessary credit facilities.

30.     On July 28, 2017, Defendants filed and served their reply papers.  Dkt. No. 88.

31.     On February 9, 2018, the Court entered an order denying Defendants' motion to dismiss the Amended Complaint.  Dkt. No. 90.  The Court found, based on the testimony of the confidential witness that BPC was on a credit hold and the Company's admission that BPC was on extended payment terms, that Plaintiffs sufficiently alleged that Capstone overstated its revenues during the relevant timeframe.  The Court also found these statements were made with scienter since the Company's executives were actively involved in Capstone's sales efforts and were in consistent communication with BPC and BPC was one of Capstone's largest and most important clients.  Moreover, the Court held that while Plaintiffs fail to plead with particularity that Defendants' representations regarding the amount of backlog were false, Plaintiffs nonetheless alleged sufficient facts showing that the opinion that the backlog is a strong indicator of future performance was misleading.

32.     On March 20, 2018, Defendants filed and served their Answer to the Amended Complaint.  Dkt. No. 93.

**F.     Discovery Commences And The Parties Agree To Mediate**

33.     With the automatic discovery stay imposed by the PSLRA having been lifted following the Court's order denying the motion to dismiss the Amended Complaint, discovery began promptly.  The Parties held a Rule 26(f) conference, filed a Joint Case Management and Federal Rule of Civil Procedure 26(f) Conference Statement with the Court (Dkt. No. 96), and submitted a stipulated protective order (Dkt. Nos. 101-02).

34.     On May 21, 2018, Defendants served their first set of Requests for Production on Lead Plaintiffs, and on May 24, 2018, the Parties exchanged Initial Disclosures.   On May 29, 2018, Defendants served Interrogatories upon Lead Plaintiffs.

35.     On June 1, 2018, Plaintiffs served their first sets of Interrogatories and Requests for Production on Defendants.

36.     Following the Court's decision denying Defendants' motion to dismiss

the Amended Complaint, the Parties began exploring whether a settlement could be reached through mediation.  On June 22, 2018, the Parties filed a stipulation with the Court requesting a temporary stay in proceedings so that the Parties could engage in private mediation.  Dkt. No. 104.  On June 26, 2018, the Court granted the temporary stay.  Dkt. No. 105.

**G.    The Mediation Process, Which Included Discovery And Substantial Briefing, Ultimately Results In A Settlement**

37.    The Parties selected former United Sates District Court Judge Layn R. Phillips, one of the leading neutrals in the country, as mediator and scheduled a mediation session for September 24, 2018.

38.    In advance of the mediation, at Plaintiffs' request, Defendants produced a substantial number of relevant documents relating to Capstone's accounts receivable and backlog, including: spreadsheets that detailed all of the Company's backlog orders on a quarterly basis; the Company's aging reports for accounts receivable during the Settlement Class Period; relevant communications between Capstone's executives and BPC, the distributor at issue; and documents regarding BPC's contract and credit terms.  Lead Counsel reviewed and analyzed Defendants' voluminous production in conjunction with their accounting expert, and also requested and received additional follow-up documents from Defendants.

39.    Following Defendants' additional productions and Lead Counsel's review of the productions, the Parties exchanged detailed mediation statements and exhibits that addressed the issues of liability, loss causation and damages. Thereafter, each Party exchanged substantial rebuttal statements and exhibits.  Both the opening and rebuttal mediation statements and exhibits were submitted to Judge Phillips in advance of the September 24, 2018 mediation.

40.    On September 24, 2018, the Parties participated in a full-day mediation session before Judge Phillips in Corona Del Mar, California.  The session, which lasted the entire day, ended without an agreement being reached.  Demonstrating

their diligent work on behalf of the Settlement Class, the Lead Plaintiffs attended the lengthy mediation session together with Lead Counsel and were actively involved in all settlement discussions.  In fact, one of the Lead Plaintiffs, Randall Kay, had direct email communications with the mediator after the mediation.

41.    While a settlement was not reached at the mediation itself, the Parties continued to explore the possibility of a settlement and continued negotiations with the assistance of Judge Phillips in the following weeks.

42.    On November 5, 2018, the Parties filed a Status Report that informed the Court that the Parties were still actively engaged in settlement discussions and provided a schedule for a class certification motion in the event that the settlement discussions did not result in a settlement.  Dkt. No. 106.

43.    On November 6, 2018, Defendants served Requests for Production on Named Plaintiffs David Kinney and John Perez.

44.    On November 9, 2018, Lead Plaintiffs provided responses and objections to Defendants' first set of Requests for Production and Interrogatories. Also, on November 9, 2018, Defendants provided their responses and objections to Plaintiffs' Requests for Production.

45.    On November 10, 2018, Judge Phillips issued a mediator's proposal to settle this Action for $5,550,000, which the Parties ultimately accepted.  On November 16, 2019, the Parties filed a Joint Stipulation informing the Court that the Parties had reached an agreement in principle to settle the case.  Dkt. No. 108.

46.    Over the next few months, the Parties negotiated the terms of the Settlement, as set forth in the Stipulation, as well as exhibits thereto.  On April 12, 2019, the Parties executed the Stipulation, which was filed with the Court, along with Plaintiffs' motion seeking preliminary approval of the Settlement, on that same day. Dkt. Nos. 116-18.

**H.    Preliminary Approval Of The Settlement**

47.    On April 23, 2019, the Court issued an order requesting additional

1   information from Lead Counsel regarding the proposed settlement.  Dkt. No. 119.

2   48.   On May 2, 2019, Lead Counsel filed a 19-page declaration in support
3   of Plaintiffs' preliminary approval motion, which attached declarations from
4   Plaintiffs' damages expert with respect to the plan of allocation, and a declaration
5   from the claims administrator regarding the proposed notice process.  Dkt. No. 120.

6   49.   On May 17, 2019, the Court held oral argument on the preliminary
7   approval motion.

8   50.   That same day, the Court entered the Preliminary Approval Order,
9   directing notice of the Settlement to be disseminated to prospective members of the
10  Settlement Class.  Dkt. No. 122.

11  51.   The Settlement Class is defined as:

12  all persons and entities who or which purchased or otherwise acquired
    Capstone common stock between June 12, 2014 and November 5,
13  2015, inclusive (the "Settlement Class Period") and were damaged
    thereby.  Excluded from the Settlement Class are Defendants; members
14  of the Immediate Family of each of the Individual Defendants; the
    Officers and/or directors of Capstone; any person, firm, trust,
15  corporation, Officer, director or other individual or entity in which any
    Defendant has a controlling interest or which is related to or affiliated
16  with any of the Defendants; and the legal representatives, agents,
    affiliates, heirs, successors-in interest or assigns of any such excluded
17  party. Also excluded from the Settlement Class are any persons or
18  entities who or which exclude themselves by submitting a request for
    exclusion that is accepted by the Court.
19
20
21  *Id.* at ¶ 1.

22  ## III.   THE SETTLEMENT IS REASONABLE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION
23

24  52.   The Settlement is fair and reasonable in light of the potential recovery
25  of available damages.  If Plaintiffs had fully prevailed on their claims at both
26  summary judgment and after a jury trial, if the Court certified the Settlement Class,
27  and if the Court and jury accepted Plaintiffs' damages theory, including proof of
28  loss causation for all of stock price drop dates alleged in this case—*i.e.*, Lead

Plaintiffs' *best case scenario*—the estimated total *maximum* damages would be approximately $29.8 million.  Thus, the $5,550,000 Settlement Amount represents approximately 18.6% of the total *maximum* damages potentially available in this Action.[3]   This amount compares favorably to other securities class action settlements, and indeed, is an excellent recovery for the Settlement Class.  *See, e.g.*, Exhibit 2 attached hereto (Stefan Boettsich and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (NERA 29 Jan. 2019)) at 35, Fig. 27 (NERA report showing the median ratio of settlements between 1996 and 2018 to investor losses was 8.4% in cases alleging losses between $20 and $49 million), & at 36, Fig. 28 (the median ratio of settlements to investor losses in 2018 was 2.6%).

53.    In contrast, Defendants would have contended that Plaintiffs' damages were greatly overstated.  As noted below, Plaintiffs believe that Defendants could put forward several damages and loss causation arguments that, if accepted, would have greatly reduced damages.  Specifically, Defendants would likely argue at summary judgment that the August 7, 2014 and October 1, 2015 disclosures were not corrective since the disclosures on those dates were unrelated to the alleged fraud.  On both of these dates, the Company announced lower-than-expected revenue to the market.  Defendants would argue that these revenue misses were the actual cause of the stock decline, not the issues related to the Company's accounts receivables and Russian distributor as alleged by Plaintiffs.  If this argument were accepted and those two disclosure dates were removed, Plaintiffs' damages would

---

[3] For a full explanation on how Plaintiffs' expert, Michael A. Marek, calculated these amounts through the application of an empirical event study, Plaintiffs respectively refer the Court to the Supplemental Declaration of Casey E. Sadler in Support of Plaintiffs' Unopposed Motion for Entry of Order Preliminarily Approving Settlement ("Sadler Supp. Decl.," Dkt. No. 120), at ¶¶ 22-27, and Mr. Marek's declaration attached thereto as Exhibit 1 (Dkt. No. 120-1).

be decreased to approximately $11.7 million.  Under this scenario, the $5,550,000 recovery equates to 47.7% of the *maximum* recoverable damages.  Accordingly, Lead Counsel's efforts have resulted in a recovery of between 18.6% and 47.7% of the Settlement Class' damages.[4]

54.    The foregoing numbers, however, tell only part of the story.  As summarized in the next section, there were very real additional risks that could have resulted in a much smaller recovery (or none at all), if the case had proceeded through formal discovery, class certification, summary judgment, trial, and likely appeal.  The Settlement, however, eliminates those risks and provides an immediate, substantial benefit to the Settlement Class that equates to almost 20% of Plaintiffs' maximum provable damages.

## IV.    THE RISKS OF CONTINUED LITIGATION

### A.    Risks To Proving Liability

55.    Plaintiffs and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability.

56.    Defendants forcefully argued in their motions to dismiss, and undoubtedly would continue to argue at summary judgment and trial, that the alleged misstatements were not actionable since the Company had reasonable bases for its accounting treatments, which its accountants did not question. Defendants would also continue to argue that the backlog figures were accurate due to the fact that its customers had not cancelled the orders at issue and that the orders still may have been fulfilled.

---

[4] Additionally, for all four of the alleged corrective disclosures, Defendants would likely argue that Plaintiffs have the burden to disaggregate the amount of stock price decline attributable to the alleged fraud as opposed to other facts.  If the Court accepted this argument and Plaintiffs were forced to disaggregate the stock price declines, this would likely greatly decrease the amount of damages.

57.     Indeed, despite believing that this Action is meritorious, Plaintiffs and Lead Counsel were well aware of the high hurdle they would have to surmount in order to successfully prove that Defendants acted with the requisite mental state of scienter—*i.e.*, an intent to deceive or extreme recklessness—to ultimately prove Defendants' liability under the federal securities laws.  Defendants insisted that their Settlement Class Period statements concerning revenue and accounts receivable were made in good faith, in particular because Defendants had a reasonable belief that BPC would ultimately pay for products as it had always done before. Additionally, Defendants have always contended that the backlog was accurate as it did not contain any cancelled orders.  Although Plaintiffs believe that they had strong counter-arguments to Defendants' assertions, there is no guarantee that the trier of fact would have found these arguments more persuasive than Defendants' explanation of events.

### B.     Risks To Proving Loss Causation And Damages

58.     Even assuming that Plaintiffs overcame the risk of establishing Defendants' liability, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.  As discussed above, Defendants would have argued that two of the four alleged corrective disclosures were not truly corrective events since the disclosures were not related to the alleged fraud, and that Plaintiffs' loss causation and damages models were flawed because they failed to disaggregate the amount of stock price decline attributable to the alleged fraud from other non-fraudulent events.  If any of these foregoing arguments was accepted by the Court or a jury, then the Settlement Class's class-wide damages would have been greatly reduced.

59.     Moreover, pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is Plaintiffs' burden to prove loss causation and damages.  This would require Plaintiffs to proffer expert testimony as to: (a) what the "true value" of Capstone's common stock would have been had there been no alleged material

misstatements or omissions; (b) the amount by which Capstone's shares were inflated by the alleged material misstatement and omissions; and (c) the amount of artificial inflation removed by the purported corrective disclosures. Defendants almost certainly would have presented their own damages expert(s) to present conflicting conclusions and theories as to the reasons for Capstone's share price declines on the alleged disclosure dates, requiring a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.

60. Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury. A jury's reaction to such expert testimony is highly unpredictable, and Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and could find that only a fraction of the amount of damages Plaintiffs contended were suffered by the Settlement Class. Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain. Similarly, there was no assurance that Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial. These issues could have seriously affected Plaintiffs' ability to successfully prosecute this Action.

61. In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated—any potential recovery by the Settlement Class.

**C.    Other Risks**

62. In addition, any future recovery would require Plaintiffs to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this. For example, Plaintiffs would have to move to certify the class, which, if granted, would likely result in Defendants filing a Rule 23(f) petition for appellate review. Plaintiffs would also have to complete substantial fact and expert discovery, which would entail, among other things,

document production, review and analysis of documents produced by Defendants and third parties, taking and/or defending percipient and expert depositions, propounding and responding to interrogatories and requests for admission, and defending the four Plaintiffs' depositions.  The costs of each of these tasks would assuredly be high, and the fruits of each endeavor would be highly uncertain. Furthermore, Plaintiffs would have to successfully navigate and prevail against Defendants' anticipated motion(s) for summary judgment, as well as at trial.  And finally, even if Plaintiffs prevailed on all of those stages, they would have to succeed on any appeals that would surely follow.  This process could extend for years and might ultimately lead to a smaller recovery, or no recovery at all.  Indeed, even prevailing at trial would not guarantee a recovery larger than the $5,550,000 Settlement.[5]

63.    In sum, having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and having considered the very real risks presented by the significant hurdles of class certification, summary judgment, trial and any eventual appeals that lie ahead, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

64.    Lead Counsel's conclusion that the Settlement is fair, reasonable and adequate is supported by both of the Lead Plaintiffs, as well as the Named Plaintiffs.

---

[5] *See also Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing jury verdict of $81 million for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

## V.   PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

65.     The Court's Preliminary Approval Order found Plaintiffs' proposed method of notice to be adequate (Dkt. No. 122 at ¶ 8), and directed that the Postcard Notice be disseminated to all Settlement Class Members who could be identified with reasonable effort, as well as brokerage firms and other nominees.   The Preliminary Approval Order also found the contents of Notice to be adequate because it set forth the ability and process for Settlement Class Members to submit objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class.   The Preliminary Approval Order also set the deadline for both objections and exclusion for October 15, 2019, and set a final fairness hearing date of November 15, 2019.   Dkt. No. 122 at ¶¶ 5, 14, 19.

66.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed Angeion Group ("Angeion"), the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and to publish the Summary Notice. Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed Angeion to post downloadable copies of the Stipulation, Notice and Claim Form online at www.CapstoneTurbineSecuritiesLitigation.com (the "Settlement Website").   Upon request, Angeion mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.   The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or exclude themselves from the Settlement Class.   The Notice (and Postcard Notice) also informed Settlement Class Members of Lead Counsel's intent to apply for an

award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $140,000.

67.    To disseminate the Postcard Notice, Angeion obtained from Capstone's transfer agent the names and addresses of 79 potential Settlement Class Members. On June 17, 2019, Angeion disseminated copies of the Postcard Notice to each of these potential Settlement Class Members by first-class mail. *See* Exhibit 1 attached hereto (Declaration of Brian Manigault Regarding: (A) Mailing of Postcard Notice; (B) Publication of Summary Notice; (C) Report on Requests for Exclusion and Objections; and (D) The Claims Administration Process ("Mailing Declaration")) at ¶¶ 4-5.

68.    In addition, Angeion maintains a proprietary list with names and addresses of known broker firms, dealers, banks, and other institutions involving publicly-traded securities (the "Broker Database") that, at the time of the initial mailing, contained 3,363 mailing records. *See id.* at ¶ 6.   On June 17, 2019, Angeion mailed copies of the Postcard Notice to the 3,363 mailing records in the Broker Database. *See id.*

69.    As of September 18, 2019, Angeion has disseminated 36,656 Postcard Notices. *See id.* at ¶ 10.

70.    On June 24, 2019, in accordance with the Preliminary Approval Order, Angeion caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶ 11.

71.    Lead Counsel also caused Angeion to establish the Settlement Website (www.CapstoneTurbineSecuritiesLitigation.com) to provide potential Settlement Class Members with information concerning the Settlement, allow for the submission of a claim online, download copies of the Notice and the Claim Form, as well as copies of the Stipulation and Preliminary Approval Order. *Id.* at ¶ 12.

72.    The deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application, or to request

exclusion from the Settlement Class is October 15, 2019.  To date, only one request for exclusion has been received.  *Id.* at ¶ 15.  Angeion will submit a supplemental affidavit after the October 15 deadline addressing any additional requests for exclusion received.  To date, no objections to the Settlement, the Plan of Allocation or the maximum amounts listed in the Postcard Notice and Notice that Lead Counsel would seek for an award for attorneys' fee and reimbursement of Litigation Expenses have been received. *Id.*  Lead Counsel will file papers on October 25, 2019, that will address any requests for exclusion and any objections that may be received.

## VI.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

73.    The proposed Plan of Allocation is detailed in the long-form Notice and incorporated by reference into the Stipulation.  *See* Stipulation at ¶ 1(gg); Mailing Declaration, Ex. E (Notice) at pp. 17-24.  The full Notice was posted on and is downloadable from the Settlement Website, and has been mailed to Settlement Class Members upon request.

74.    As set forth in the Notice, under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its pro rata share of the Net Settlement Fund, which is the Settlement Fund (*i.e.*, the $5,550,000 Settlement Amount plus any and all interest earned thereon) less any: (a) Taxes; (b) Notice and Administration Costs; (c) Litigation Expenses awarded by the Court; and (d) attorneys' fees awarded by the Court.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.[6]

---

[6] If the amount to be distributed to an Authorized Claimant calculates to less than $10.00, no such distribution will be made to the Authorized Claimant.

75.     The proposed Plan of Allocation reflects, and is based upon, Plaintiffs' allegation that the price of Capstone common stock was artificially inflated during the Settlement Class Period due to Defendants' alleged materially false and misleading statements.  As explained in detail in the Marek Declaration (Dkt. No. 120-1), the Plan of Allocation is based on the generally accepted concept that the losses of shareholders are reflected in the difference between estimated artificial inflation per share present on the date of purchase and estimated artificial inflation per share present following a corrective disclosure or date of sale.  *See id.*, at ¶¶ 11-13.  For the Plan of Allocation, Mr. Marek used his loss causation analysis and event study to determine the appropriate artificial inflation per share. *See id.* at ¶¶ 4-13.

76.     Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Amended Complaint.

77.     Moreover, there has not been a single objection to the Plan of Allocation from any of the Settlement Class Members.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## VII.   THE FEE AND LITIGATION EXPENSE APPLICATION

78.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees of 26.2% of the Settlement Fund (or $1,454,500, plus interest earned at the same rate as the Settlement Fund).  Lead Counsel are also requesting reimbursement of out-of-pocket expenses that Lead Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $78,084.47.  Finally, pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Counsel are requesting reimbursement to Plaintiffs in the total amount of $31,000 for costs, including lost wages, incurred in representing the Settlement Class.   The legal authorities

supporting the requested fee and reimbursement of Litigation Expenses are set forth in the concurrently-filed Fee Memorandum.   The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.     The Fee Application

79.     For their efforts on behalf of the Settlement Class, Lead Counsel are applying for a percentage of the common fund fee award to compensate them for the services they have rendered on behalf of the Settlement Class.  As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award because, unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class.  The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances.   This paradigm minimizes unnecessary drain on the Court's resources.   Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature.

80.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be approved.  As discussed in the Fee Memorandum, a 26.2% award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit and, indeed, it is only a slight increase from the Ninth Circuit's 25% "benchmark award."  Moreover, the requested fee award was negotiated by Lead Counsel and Lead Plaintiff Randall Kay and approved by each of the Plaintiffs.

1          **1.      The Work And Experience Of Lead Counsel**

2          81.    As set forth below, GPM's total lodestar is $1,398,140.25,[7] consisting

3    of $1,280,288.75 for attorney time and $117,851.50 for professional support staff

4    time:

**GPM Lodestar Chart**

| TIMEKEEPER | STATUS | HOURS | RATE ($) | LODESTAR ($) |
|---|---|---|---|---|
| **ATTORNEYS:** | | | | |
| Lionel Z. Glancy | Partner | 32.00 | 960.00 | 30,720.00 |
| Joseph Cohen | Partner | 45.50 | 935.00 | 42,542.50 |
| Kevin F. Ruf | Partner | 83.75 | 935.00 | 78,306.25 |
| Jason Krajcer | Partner | 49.00 | 775.00 | 37,975.00 |
| Robert Prongay | Partner | 218.50 | 750.00 | 163,875.00 |
| Lesley Portnoy | Partner | 45.00 | 650.00 | 29,250.00 |
| Casey Sadler | Partner | 808.00 | 650.00 | 525,200.00 |
| Peter A. Binkow | Of Counsel | 27.50 | 875.00 | 24,062.50 |
| Stanislav Karas | Of Counsel | 183.00 | 775.00 | 141,825.00 |
| Christopher Fallon | Associate | 211.05 | 550.00 | 116,077.50 |
| Leanne Heine | Associate | 124.90 | 550.00 | 68,695.00 |
| Charles Linehan | Associate | 51.20 | 425.00 | 21,760.00 |
| **TOTAL ATTORNEY** | | **1,879.40** | | **1,280,288.75** |
| **PARALEGALS:** | | | | |
| Harry Kharadjian | Senior Paralegal | 69.50 | 290.00 | 20,155.00 |
| Samantha Skouras | Paralegal | 18.50 | 200.00 | 3,700.00 |
| Jack Ligman | Research Analyst | 63.25 | 310.00 | 19,607.50 |
| Erin Krikorian | Research Analyst | 152.00 | 290.00 | 44,080.00 |
| Michaela Ligman | Research Analyst | 62.60 | 290.00 | 18,154.00 |
| Danielle Goldsmith | Research Analyst | 55.25 | 220.00 | 12,155.00 |
| **TOTAL PARALEGAL** | | **421.10** | | **117,851.50** |
| **TOTAL LODESTAR** | | **2,300.50** | | **1,398,140.25** |

---

[7] The lodestar figure contains only the time of GPM attorneys and professional staff that billed more than fifteen hours to the Action.

82.     The Lodestar Chart sets forth the amount of time GPM attorneys and professional support staff billed from inception of the Action through and including September 23, 2019, and the lodestar calculation for those individuals based on GPM's current billing rates.

83.     GPM's attorneys and professional support staff rates have recently been accepted as reasonable by other courts in the Ninth Circuit.  *See In re CytRx Corp. Sec. Litig.*, 2018 WL 8950655, at *1-2 (C.D. Cal. Sept. 17, 2018); *In re K12 Inc. Sec. Litig.*, 2019 WL 3766420, at *2 (N.D. Cal. July 10, 2019).[8]  Additionally, when determining the market rate by looking at fees awarded in similar cases, the rates billed by Lead Counsel (ranging from $425-$550 per hour for non-partners and $650-$960 per hour for partners and "Of Counsel" attorneys) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 3 attached hereto (table of peer firm billing rates).

84.     The Lodestar Chart was prepared from contemporaneous daily time records regularly prepared and maintained by GPM.  Time expended on the Fee and Expense Application has not been included in this request.  Nor does the lodestar include any of the time spent after September 23, 2019 on the preparation of the final approval papers, attendance at the final approval hearing, and any further work in overseeing the claims and distribution process.

85.     Thus, the resulting total lodestar for the Lead Counsel are $1,398,140.25.   The requested fee of 26.2% of the Settlement Fund represents $1,454,500 (plus interest), which equates to a multiplier of 1.04 on this lodestar.  The 1.04 multiplier is fair and reasonable based on the risks of the litigation, the quality of the representation, and the results obtained.  As discussed in further detail

---

[8] As stated in the Fee Memorandum, GPM's rates are substantially the same as rates that have been accepted by other courts in the Ninth Circuit in similar complex litigation.

in the Fee Memorandum, the requested multiplier is below the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk in this Circuit.

86.     As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.  I maintained daily control of and monitored the work performed by many of the lawyers and other personnel on this case.  I personally devoted substantial time to this case, and other experienced attorneys at my firm similarly devoted substantial time to prosecuting this matter—*i.e.*, drafted, reviewed and/or edited all pleadings, court filings, mediation statements, and other correspondence prepared on behalf of Plaintiffs; communicated with Plaintiffs; engaged with defense counsel on a variety of matters; and were involved in Settlement negotiations and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, I believe Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action.

87.     As demonstrated by the firm resume attached as Exhibit 4 hereto, Lead Counsel are experienced in the securities litigation field, with a long and successful track record representing investors in such cases.  GPM has successfully prosecuted securities class action cases and complex litigation in federal and state courts throughout the country.  I respectfully submit that the Settlement (and its quality) was due to counsel's hard work, persistence, and skill—and that their diligence and the results achieved both fully merit the requested fee.

### 2.     Standing And Caliber Of Defendants' Counsel

88.     The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Wilson Sonsini Goodrich & Rosati, which is a capable and renowned law firm that vigorously represented the interests of their

clients throughout this Action.  In the face of this experienced and formidable opposition, Lead Counsel were nonetheless able to persuade Defendants to settle the case on terms that I believe are favorable to the Settlement Class.

### 3. The Risks Of Litigation And The Need To Ensure The Availability Of Competent Counsel In High-Risk Contingent Securities Cases

89.    This Action was undertaken by Lead Counsel on an entirely contingent-fee basis.  From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, to ensure that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this.

90.    With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during the course of the Action and incurred $78,084.47 in out-of-pocket litigation-related expenses in prosecuting the Action.

91.    Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Lead Counsel know from personal experience that despite the most vigorous and competent of efforts, success in contingent litigation is never assured.  In fact, GPM recently lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

92.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("[P]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets[.]") (internal quotation marks omitted).  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

93.     Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 4.     The Reaction Of The Settlement Class To The Fee Application

94.     As noted above, as of September 18, 2019, 36,656 Postcard Notices have been mailed advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund.  *See* Mailing Decl. Ex. A.[9]   In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  *Id.* at ¶ 12 & Exs. C & D (confirmation of publication of

---

[9]  The Postcard Notice also referred Settlement Class Members to the Settlement Website and the Notice, which also contained this information.

Summary Notice).  To date, no objections to the attorneys' fees maximum have been received.  Any objections received after the date of this filing will be addressed in Lead Counsel's Final Approval Motion to be filed by October 25, 2019.

95.   In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success.   Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 26.2%, resulting in a multiplier of 1.04, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### 5.   Plaintiffs Support The Fee Application

96.   As set forth in the declarations submitted by the Plaintiffs, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Ex. 5 (Declaration of Randall Kay) at ¶ 7; Ex. 6 (Declaration of Elizabeth Kay) at ¶ 6; Ex. 7 (Declaration of David Kinney) at ¶ 7; Ex. 8 (Declaration of John Perez) at ¶ 7.  Plaintiffs have been extremely involved in this case since its early stages, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.   Moreover, the amount of the fee request was specifically negotiated between Lead Plaintiff Randall Kay—a sophisticated businessman with a significant stake in the litigation—and Lead Counsel, which further supports the request.

### B.   The Litigation Expense Application

97.   Lead Counsel seek a total of $109,084.47 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes $78,084.47 in out-of-pocket costs and expenses reasonably and necessarily incurred by Lead Counsel in

connection with commencing, litigating, and settling the claims asserted in the Action and $31,000 in costs, including lost wages, incurred by Plaintiffs.

98.   As detailed below, Lead Counsel are seeking reimbursement of a total of $78,084.47 in out-of-pocket costs and expenses:

| ITEM | AMOUNT |
|---|---|
| COURIER & SPECIAL POSTAGE | $249.84 |
| COURT FILING FEES | $797.71 |
| EXPERTS | $46,005.00 |
| INVESTIGATIONS | $12,949.20 |
| MEDIATION | $8,006.17 |
| ONLINE RESEARCH | $7,652.97 |
| PHOTOIMAGING | $150.00 |
| PRESS RELEASES | $145.00 |
| SERVICE OF PROCESS | $192.39 |
| TRAVEL AUTO | $141.39 |
| TRAVEL HOTEL | $1,222.78 |
| TRAVEL MEALS | $430.12 |
| TRAVEL PARKING | $141.90 |
| GRAND TOTAL | $78,084.47 |

99.   As stated above, Plaintiffs seek reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of their reasonable costs (including lost wages) directly incurred in connection with their representation of the Settlement Class, in the amounts of $22,500, $3,500, $2,500 and $2,500 for Lead Plaintiff Randall Kay, Lead Plaintiff Elizabeth Kay, named plaintiff David Kinney and named plaintiff John Perez, respectively.  *See* Ex. 5 (Declaration of Randall Kay) at ¶¶ 9-10; Ex. 6 (Declaration of Elizabeth Kay) at ¶¶ 8-9; Ex. 7 (Declaration of David Kinney) at ¶¶ 9-10; Ex. 8 (Declaration of John Perez) at ¶¶ 9-10.  As outlined in their declarations, all of the Plaintiffs were active in this litigation and spent substantial time on the Action. Notably, Lead Plaintiff Randall Kay—who attended the lead plaintiff hearing, produced hundreds of pages of documents and communications regarding the Action, was an active participant in the mediation that he attended with Elizabeth

Kay, and was an invaluable resource regarding the Company—was a driving force for the excellent Settlement achieved.  Based on my understanding of the work they performed on behalf of the Settlement Class, I believe that the requested awards are justified.

100.   The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses, including reimbursement to the Plaintiffs, in an amount not to exceed $140,000.  The total amount requested by Lead Counsel and Plaintiffs, $109,084.47, is substantially below the $140,000 that Settlement Class Members were advised could be sought.  To date, no objections have been raised as to the maximum amount of expenses set forth in the Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in the Final Approval Motion to be filed on October 25, 2019.

101.   From the beginning of the case, Lead Counsel were aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action.  Accordingly, Lead Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

102.   Of the total amount of Lead Counsel's out-of-pocket costs and expenses, $46,005.00 or 58.9%, was expended on Plaintiffs' experts.  Plaintiffs' retained experts in the fields of loss causation, damages and accounting to assist in the prosecution of the Action.

103.   Plaintiffs' experts on accounting assisted Lead Counsel in their review Capstone's financial statements, provided valuable insight into the complex

1 accounting rules and regulations at issue, and helped formulate Plaintiffs'
2 allegations.  Beyond assisting in the development of Plaintiffs' theories of the case
3 and drafting of the complaints, Plaintiffs' expert on damages and loss causation
4 assisted Lead Counsel during the mediation and settlement negotiations with the
5 Defendants, and also developed the proposed Plan of Allocation in consultation with
6 Lead Counsel.

7 104. Additionally, Lead Counsel paid $8,006.17 for their share of the
8 mediation fees owed to Phillips ADR for the services of Judge Phillips and his team,
9 which is 10.3% of Lead Counsel's total expenses.  Another substantial component
10 of Lead Counsel's out-of-pocket costs and expenses was for the services of private
11 investigators, which included conducting numerous fact interviews with former
12 Capstone employees and other relevant third parties in connection with Lead
13 Counsel's investigation.   The charges for the private investigators' services
14 amounted to just under $13,000, or approximately 16.6% of Lead Counsel's out-of-
15 pocket costs and expenses.

16 105.  Another significant component Lead Counsel's out-of-pocket costs and
17 expenses was for online legal and factual research, which was necessary to prepare
18 the complaints and research the law pertaining to the claims asserted in the Action.
19 The charges for on-line research amounted to $7,652.97, or 9.8% of the total amount
20 of out-of-pocket expenses.

21 106. The other litigation expenses for which Lead Counsel seek
22 reimbursement are the types of expenses that are necessarily incurred in litigation
23 and routinely charged to clients billed by the hour.  These include, among others,
24 court fees, travel costs, copying costs, and postage and delivery expenses.

25 107.  In my opinion, the Litigation Expenses incurred by Lead Counsel and
26 Plaintiffs were reasonable and necessary to represent the Settlement Class and
27 achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the
28 Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VIII.  CONCLUSION

108.  For all the reasons set forth above, I respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  I further submit that the requested fee in the amount of 26.2% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $109,084.47 (which includes $31,000 for Plaintiffs' costs) should also be approved.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 24, 2019, in Los Angeles, California.

*s/ Casey E. Sadler*
Casey E. Sadler

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.   On September 24, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed on September 24, 2019, at Los Angeles, California.


*s/ Casey E. Sadler*
Casey E. Sadler